IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| *In re:* | : | Case: 13-12598 |
| COMMERCE LLC, | : | Chapter 7 |
| *Debtor.* | : | Adversary Proceeding No. 15-00068 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ZVI GUTTMAN, Chapter 7 Trustee for the    :
Bankruptcy Estate of Commerce, LLC, *et al.*

           :

       *Plaintiffs*

           :

       v.

           :

SAUL EWING LLP, *et al.*

           :

       *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM IN SUPPORT OF
## MOTION OF ZVI GUTTMAN, CHAPTER 7 TRUSTEE,
## <u>PLAINTIFF, FOR ABSTENTION AND/OR REMAND</u>

Dated:  March 16, 2015

Arnold M. Weiner (Bar No. 01605)
Aron U. Raskas (Bar No. 04393)
Barry L. Gogel (Bar No. 25495)
Rifkin Weiner Livingston
  Levitan & Silver, LLC
2002 Clipper Park Road, Suite 108
Baltimore, Maryland 21211
Tel: (410) 769-8080
Fax: (410) 769-8811

*Attorneys for Plaintiff Zvi Guttman, Chapter 7 Trustee for
the Bankruptcy Estate of Commerce, LLC*

## TABLE OF CONTENTS

OVERVIEW ................................................................................................................... 1

BACKGROUND ........................................................................................................... 2

THE BANKRUPTCY CASE ......................................................................................... 3

THE STATE COURT ACTION ..................................................................................... 5

    A.    The Essence of the Complaint.............................................................. 5

    B.    Eidelman Was Informed Of Cork's Fraudulent Conduct
          Yet Agreed To Not Inform Lessans Of It ............................................ 6

    C.    Eidelman, Working With Jacober at Cork's Direction,
          Took Affirmative Actions That Prevented Lessans from
          Learning About O'Kane's Warnings of Cork's Fraudulent
          Conduct.................................................................................................. 8

    D.    Safe From Detection, Cork Continued To Pursue His
          Fraudulent Scheme For More Than Another Year................................. 9

    E.    In June 2012, More Than A Year After Eidelman Was Alerted,
          Commerce's Successor CFO Discovered Cork's Fraud and
          Reported It to Lessans ......................................................................... 9

    F.    Eidelman Acknowledged His Culpability to Lessans ......................... 10

    G.    A Forensic Investigation Confirmed O'Kane's Information
          And Uncovered The Details Of Cork's Fraudulent Scheme ................. 10

    H.    Eidelman's Acts and Omissions Allowed Cork to Further
          Pursue His Fraudulent Scheme and Were a Substantial and
          Contributing Factor to the Demise of Commerce ................................. 11

    I.    The State Court Action Asserts Four Causes of Action
          Under State Law Against Saul Ewing and Eidelman............................ 12

THE REMOVAL, ANSWER AND COUNTERCLAIMS ................................................. 14

ARGUMENT ................................................................................................................. 14

i

I.  THIS IS A CASE FOR MANDATORY ABSTENTION .................................................. 14

    A.  Defendants Dispute Only One Of The Statutory Elements.................................... 14

    B.  The State Court Action Relates To A Bankruptcy Case But Is A
        Non-Core Proceeding .......................................................................................... 15

    C.  There Is No Core Jurisdiction Under 28 U.S.C. § 157(b)(2)(c) ............................ 17

    D.  Defendants Cannot Convert The Non-Core State Court Action
        Into Core Proceedings By Raising Complaints About The
        Separate Proceedings Authorizing The Employment Of
        Counsel Pursuant To 11 U.S.C. §§ 327 and 328 .................................................. 19

    E.  The State Court Proceeding Is Not A Core Matter Under The
        Catch-All Provisions Of 28 U.S.C. § 157(b)(2)(O) .............................................. 21

II.  THIS COURT, IN THE EXERCISE OF ITS DISCRETION,
    SHOULD ABSTAIN FROM THE STATE COURT ACTION
    PURSUANT TO 28 U.S.C. § 1334(C)(1) ............................................................... 23

    A.  The Courts Have Identified Various Factors In
        Determining Whether To Exercise Permissive Abstention.................................... 23

    B.  The Factors In This Case Weigh Heavily In Favor Of Abstention ....................... 24

        (1)  Efficient Administration of the Debtor's Estate ......................................... 24

        (2)  Extent To Which State Law Issues Predominate
              Over Bankruptcy Issues.............................................................................. 25

        (3)  Whether The Issues Involve Difficult Or Unsettled
              Questions of State Law That Would Be Better
              Addressed By A State Court........................................................................ 25

        (4)  The Presence Of A Related Proceeding Commenced
              In State Court.............................................................................................. 26

        (5)  The Existence Of A Jurisdictional Basis Other
              Than § 1334 ............................................................................................... 26

        (6)  The Degree of Relatedness Or Remoteness Of The
              Proceeding To The Main Bankruptcy Case................................................. 26

        (7)  The Substance Rather Than The Form Of An
              Asserted "Core" Proceeding....................................................................... 27

(8)    The Feasibility Of Severing State Law Claims
From Core Bankruptcy Matters To Allow
Judgment To Be Entered In State Court ....................................................27

(9)    The Burden Of The Federal Court's Docket .............................................27

(10)   The Likelihood That The Commencement Of
The Proceeding In Federal Court Involves Forum
Shopping By The Defendants....................................................................28

(11)   The Existence Of A Right To Jury Trial ..................................................29

(12)   Whether Non-Debtor Parties Are Involved In
The Proceeding .........................................................................................29

III.    EQUITABLE REMAND OF THE STATE COURT ACTION
IS ALSO APPROPRIATE .................................................................................29

IV.   WHILE DEFENDANTS' COMPLAINTS ABOUT THE
ENGAGEMENT OF SPECIAL COUNSEL FOR THE
TRUSTEE HAVE NO PLACE IN THE CONSIDERATION
OF ABSTENTION OR REMAND OF THE STATE COURT
ACTION, DEFENDANTS HAVE MADE ASSERTIONS
ABOUT THE ENGAGEMENT THAT SHOULD NOT GO
UNANSWERED ................................................................................................30

CONCLUSION ............................................................................................................34

## OVERVIEW

On January 14, 2015, Zvi Guttman, Chapter 7 Trustee of the Bankruptcy Estate of Commerce LLC ("Commerce"), Commerce Corporation, the sole member of the LLC and Richard J. Lessans, the majority owner of the Commerce Corporation, filed this action (the "State Court Action") in the Circuit Court for Baltimore City against their former attorneys, Saul Ewing LLP and Gary Eidelman, Esq.  Complaint, Exhibit "A" hereto.  Plaintiffs aver that, beginning in April 2011, Defendants actively assisted Malcomb Cork, the President of Commerce, in concealing from the Plaintiffs information that Cork was engaged in a scheme to defraud Commerce and that, when Cork's scheme was uncovered more than a year later, Commerce had been so debilitated by Cork that it could no longer survive.

The State Court action relates solely to pre-petition misconduct and states causes of action based entirely on Maryland law.  Plaintiffs have requested a jury trial in the State court. Defendants have filed an Answer asserting affirmative defenses and a Counterclaim against Commerce Corporation and Lessans, all based on State law.  Furthermore, one of the Plaintiffs, Commerce Corporation, is neither a debtor nor a creditor of the bankruptcy estate, and one of the Defendants, Eidelman, does not claim to be a creditor.

On February 14, 2015, Defendants removed the State Court Action to this Court.  Plaintiffs have moved the Court to abstain from hearing the State Court Action pursuant to the mandatory abstention statute, 28 U.S.C. § 1334(c)(2), to abstain pursuant to the permissive abstention statute, 28 U.S.C. § 1334(c)(1), and to remand the case on equitable grounds pursuant to the bankruptcy

removal statute, 28 U.S.C. § 1452(b).[1]  As explained more fully below, the State Court Action

meets the criteria for all three of these forms of relief.

## BACKGROUND

In 1923, the Lessans family established the business that would eventually become

Commerce, LLC.  Commerce Corporation is the sole member of Commerce, LLC. Lessans is the

majority owner of Commerce Corporation and was the Chief Executive Officer of Commerce

LLC.  Complaint in State Court Action ("Complaint"), Exhibit "A" hereto, ¶ 11.

The Lessans family grew Commerce to become the largest independent lawn and garden

distributor in the United States, and the largest distributor of Scotts™ lawn and garden products.

By 2011, the year when Defendants engaged in the wrongful acts that caused the Debtor's demise,

Commerce had approximately 275 employees and operated out of warehouse space in four states.

Commerce remained profitable through the great recession of 2008, maintaining its position in the

industry and its substantial profitability.  In the year ending December 2010, Commerce had sales

totaling nearly $205 million, and generated a gross profit on goods sold of nearly $42 million.

Commerce's reported 2010 EBITDA (earnings before income taxes, debt and amortization) was

$4,247,625.  Complaint, ¶¶ 12-13.

Saul Ewing and Eidelman were for many years the lawyers for the Lessans family and the

Plaintiff entities.  According to Saul Ewing, its "time and billing records show 95 matters for

Commerce LLC ("LLC") that go back to 1985.  [Its] time and billing records also have 28 matters

for Commerce Corporation . . . that begin in 1998."  June 14, 2013 e-mail from Timothy Callahan,

Esq. to Zvi Guttman, Esq., Exhibit "B" hereto.  Saul Ewing also represented the Lessans family

---

[1] The Trustee has filed his own Motion which Commerce Corporation and Lessans have separately
adopted.  This Memorandum sets forth the facts and arguments that support both Motions.

on other matters and provided tax and estate planning services to Lessans and Commerce Corporation. Complaint, ¶¶ 15, 18.

In 2011, as part of Saul Ewing's continuing representation, Eileen Day O'Brien, Esq., a Saul Ewing lawyer, performed services for Lessans and Commerce Corporation that required her to obtain a valuation of Commerce as of December 31, 2010. The valuation, performed by Tucker & Meltzer under an engagement agreement with Saul Ewing, valued the company at approximately $18.8 million. As Ms. O'Brien wrote on October 20, 2011, "Commerce is seen as having a tremendous potential for appreciation in the years ahead." Complaint, ¶¶ 18, 57.

### THE BANKRUPTCY CASE

As detailed more fully in the Complaint, acts and omissions committed by Eidelman and Saul Ewing enabled Commerce's President, Malcomb Cork, to undertake a scheme to defraud Commerce for his own personal benefit.[2]  Eidelman and Saul Ewing actively participated in concealing Cork's scheme, and it remained undetected until June 2012. By that time, Cork had so damaged the company that it could not be restructured and could not survive. Complaint, ¶¶ 1-4, 15-57.

On February 15, 2013, creditors of Commerce filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against Commerce. On March 14, 2013, the action was converted to a chapter 11 case, and on May 9, 2013, it was reconverted to a case under chapter 7. On May 10, 2013, the Office of the United States Trustee appointed Zvi Guttman as the Chapter 7 Trustee for the Bankruptcy Estate of Commerce, LLC. Complaint, ¶ 4.

---

[2] On March 20, 2014, a Grand Jury of the United States District Court for the District of Maryland issued an indictment against Cork for his actions.

3

On September 4, 2013, Saul Ewing filed a Proof of Claim in the bankruptcy case for the sum of $25,761.72 (Claim No. 190-1) (the "Saul Ewing Claim"). The Saul Ewing Claim concerned work that Saul Ewing had "rendered between December 2012 and January 2013," the two months prior to the Petition Date. Notice of Removal, ¶ 2. None of that work relates to the period when Eidelman and Saul Ewing engaged in the conduct, alleged in the Complaint, that led to the Debtor's demise.[3]

On August 6, 2013, the Trustee filed an Application to Employ Special Counsel for Trustee on Contingency Fee Basis. (Doc. 195). The purpose of the proposed employment was to investigate a potential claim against the Debtor's auditor, and, if warranted, to pursue that claim. The Application included a Verified Statement from undersigned counsel. The Court entered an Order approving the employment of special counsel on August 28, 2013. (Doc. 206).

In the course of investigating the possible claim against the auditor, special counsel discovered additional facts leading to the conclusion that a significant and viable cause of action existed against Eidelman and Saul Ewing (the "Additional Claims"). Accordingly, on December 10, 2014, the Trustee filed an Amended Application for Expanded Authority to Employ Special Counsel for Trustee (the "Amended Application") (Doc. 464-1). On December 29, 2014, the Court entered an Order Approving Amended Application for Expanded Authority to Employ Special Counsel for Trustee on Contingent Fee Basis. (Doc. 467).

---

[3] Indeed, Defendants effectively concede that the Saul Ewing Claim is distinct from the causes of action set forth in the State Court Action. *See* Notice of Removal, p. 11, n. 2 (citing *Stern v. Marshall*, 131 S. Ct. 2594 (2011)). Recently, in *Exec. Bens. Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2173 (2014), the Supreme Court held that the Constitution requires that *Stern* claims be labelled as non-core.

## THE STATE COURT ACTION

A.    The Essence of the Complaint

On January 14, 2015, as described above, the Trustee, Commerce Corporation and Lessans filed the State Court Action suit against Saul Ewing and Eidelman in the Circuit Court for Baltimore City.  (Exhibit "A" hereto).  The Complaint avers causes of action under Maryland law for negligence-legal malpractice, breach of agency contract, constructive fraud and intentional concealment.  All of the causes of action are based on pre-petition misconduct by the Defendants.

The Complaint in the State Court Action avers that Plaintiffs, including the Debtor, were clients who engaged, and placed great trust and faith in, Defendants Saul Ewing and Eidelman as their lawyers and advisors.  Saul Ewing and Eidelman, however, betrayed that trust and faith – and committed an egregious disservice to their clients – when they chose, in April 2011, to disregard the obvious interests of Plaintiffs and, instead, accepted instructions from Cork, Commerce's President, to conceal from Plaintiffs the accusations brought to Eidelman by Commerce's Chief Financial Officer about Cork.  Complaint, ¶ 1.

The Complaint further alleges that Eidelman knew from his representation of Commerce that the day-to-day affairs of Commerce were run by Cork, its President.  Cork oversaw the payment of Saul Ewing's bills, and he was responsible for Commerce's continued employment of Saul Ewing.  Eidelman was also aware that, in the event the Lessans family chose to sell the Company, Cork had the "right of first refusal" to match any legitimate offer.  Thus, Saul Ewing and Eidelman understood that the road to further engagement and legal fees for Saul Ewing ran through the door to Cork's office.  Eidelman therefore sought to develop a close and personal relationship with Cork.  Complaint, ¶ 16.

Saul Ewing and Eidelman were nonetheless also aware that Lessans was the effective owner of Commerce. Saul Ewing and Eidelman further knew and understood that Cork reported to Lessans and, most importantly, that Lessans had the ultimate authority in the Company, including the right to terminate Cork's employment. Complaint, ¶ 17. Nonetheless, as the Complaint in the State Court Action alleges, Eidelman and Saul Ewing disregarded the Plaintiffs' interest, and the duties that Saul Ewing and Eidelman had to them, and affirmatively colluded with Cork to conceal from Lessans the allegations of Cork's fraud. Had Saul Ewing and Eidelman fulfilled their duties to Plaintiffs in April 2011, Cork's fraud would have been discovered and Commerce would have survived. Instead, Defendants' misconduct led to the Debtor's bankruptcy.

B.    Eidelman Was Informed Of Cork's Fraudulent Conduct Yet Agreed To Not Inform Lessans Of It

On April 19, 2011, Bryant O'Kane, CFO of Commerce, left his employment and sent a letter to Carol Jacober, the Director of Human Resources for Commerce, asserting that he had been harassed. O'Kane asserted his claim against Commerce, Commerce Corporation and Messrs. Lessans and Cork. Jacober promptly transmitted a copy of that letter to Cork, who advised her to work with Eidelman to handle the allegations made by O'Kane. Jacober sent a copy of the April 19, 2011 letter to Eidelman. Complaint, ¶ 27.

The following day, April 20, 2011, O'Kane sent letters to both the Maryland Commission on Human Relations and the United States Equal Employment Opportunity Commission that were virtually identical to the letter that he had sent Jacober the previous day. O'Kane addressed copies of those two letters to Jacober, Cork, and, most importantly, to Lessans. However, as described below, Cork and Jacober intercepted all of O'Kane's communications copied to Lessans or otherwise concerning O'Kane's claims, and none ever reached Lessans. Eidelman received copies

6

of all of those communications and was informed by Cork and Jacober that they were not being delivered to Lessans. Complaint, ¶¶ 28, 31, 34.

Among the claims set forth in each of O'Kane's letters was one very striking revelation that O'Kane made about the scheme by Cork to defraud Commerce. Each letter prominently stated the following:

> A similar situation arose regarding a loan that Cork received on July 15, 2010 from Commerce. On that day, Cork abruptly advised me that he needed a $450,000.00 personal loan from Commerce with the funds wired to his account by 2 p.m. Lessans was not available and I indicated that it would need to be signed off by [Jacober] and the Comptroller, Melinda Bowling, which it was. I was not aware of whether the loan documentation has ever been presented to Lessans. I did not personally convey the loan matter to Lessans based on the prior incident and his admonition not to ever bother him about personal compensation issues involving him and Cork. *I later came across information suggesting that Cork may be concealing the loan, namely what appears to be a modified audited financial statement.* Cork repeatedly assured me that the loan would be paid but *I believe it remains outstanding. At times when I inquired about the loan, Cork would reverse himself and state things such as "[expletive] him, I am not paying him," referring to the repayment of the loan to Lessans and Commerce.*

Complaint, ¶ 29 (emphasis added).

In light of the fact that O'Kane's letters stated very specific and detailed facts about dishonest conduct on the part of Cork, and was based upon personal knowledge that O'Kane had acquired in his capacity as the Chief Financial Officer of Commerce, there was every reason for Eidelman to take with the utmost seriousness the assertions that Cork was committing theft and altering audit reports, to investigate the assertions, and, more importantly, to alert Lessans to them. Complaint, ¶ 30.

Rather than pursue O'Kane's allegations and report them to Lessans, the one individual at Commerce with higher authority than Cork and the effective owner of Commerce, Saul Ewing

and Eidelman instead acceded to Cork's importuning that Eidelman not communicate directly with Lessans. In one particular telephone call, Cork told Eidelman and Jacober that they were not to discuss O'Kane's letter with Lessans. In other conversations with Eidelman, Cork and Jacober reiterated that Eidelman should communicate only with them and not with Lessans. Cork also instructed Eidelman to work out an arrangement or settlement with O'Kane's lawyer to "just make it go away." Thus, instead of investigating Cork, Eidelman became Cork's puppet. Complaint, ¶ 31.

The very fact that Cork was asking Eidelman to do precisely what Cork stood accused of – concealing allegations of Cork's financial improprieties from Lessans – should have caused Saul Ewing and Eidelman to recognize that it was imperative for them to report the matter to Lessans. Yet, Eidelman agreed to keep O'Kane's evidence hidden from Lessans because Cork asked him to do so. As a result, Lessans never learned about those allegations. Complaint, ¶ 32.

      C.     Eidelman, Working With Jacober at Cork's Direction, Took
Affirmative Actions That Prevented Lessans from Learning
About O'Kane's Warnings of Cork's Fraudulent Conduct

Eidelman called O'Kane's counsel to request that he and O'Kane transmit no further communications directly to Commerce, where Lessans might learn of them. Simultaneously, Jacober – at Cork's direction and with Eidelman's knowledge – collected all of the letters that O'Kane had sent to Commerce, including the copies of letters and documents contained in envelopes mailed to the attention of Lessans at Commerce. Jacober took the envelopes to her home and, at Cork's direction, clandestinely delivered the envelopes to Cork at a restaurant in Linthicum, Maryland. Eidelman was aware that Jacober was intercepting those communications. Complaint, ¶ 34.

At Cork's further instruction, Jacober asked Eidelman to "get the EEOC and MHRC to agree to send their notices and correspondence on the O'Kane matter to you [Eidelman] rather than [to Commerce]." Complaint, ¶ 35. Eidelman reported to Cork and Jacober that he had done so. *Id.*

As a result, Eidelman knew that no information about O'Kane and, particularly, the statements that O'Kane had made concerning Cork, would reach Lessans through Eidelman, Cork, Jacober or any other source. Eidelman then pursued Cork's mandate to settle O'Kane's claims, without informing Lessans. Eidelman should reasonably have recognized that the only way in which Lessans could learn that Cork stood accused of stealing from Lessans' company, and of falsifying financial statements to conceal that theft, would be if Eidelman were to tell Lessans. Yet, Saul Ewing and Eidelman deliberately refrained from doing so. Complaint, ¶¶ 36-37.

      D.    Safe From Detection, Cork Continued To Pursue His Fraudulent Scheme For More Than Another Year

Continuing to pursue his fraudulent scheme, Cork caused Commerce to wire nearly $550,000 of additional funds to bank accounts that Cork controlled. Cork also manipulated Commerce's financial reporting and caused Commerce to overstate its 2011 profits by approximately $4.7 million. Having artificially increased Commerce's reported profitability, Cork caused Commerce to pay him a 5% profit interest. Complaint, ¶¶ 38-39.

      E.    In June 2012, More Than A Year After Eidelman Was Alerted, Commerce's Successor CFO Discovered Cork's Fraud and Reported It to Lessans

In late June 2012, Dennis Koerner, O'Kane's successor as CFO of Commerce, discovered that a $150,000 check that Cork had asked Koerner to write to a third person had been fraudulently deposited by Cork into an account that Cork controlled for his own personal benefit. Koerner promptly reported his discovery to Lessans. Complaint, ¶¶ 41-43.

Lessans, who still knew nothing about O'Kane's statements about Cork, or even that O'Kane had brought a complaint that Cork had settled, sought the advice of Saul Ewing and Eidelman. With Cork's misconduct out in the open, Eidelman had no choice but to assist Commerce in terminating Cork's employment on June 25, 2012. The subsequent investigation of Cork uncovered further details of Cork's scheme and substantiated the claims that O'Kane had made more than a year previously. Complaint, ¶ 44.

F.    Eidelman Acknowledged His Culpability to Lessans

On July 22, 2012, almost a month after Cork was fired, Eidelman called Lessans and told him that he had something that he needed to share with him. At a breakfast meeting the following morning, Eidelman presented to Lessans the very letter that O'Kane had delivered to the company - and had also addressed to Lessans - in April 2011. Eidelman admitted that he should have shared it with Lessans in April 2011, when he received a copy, but that he had not done so because Cork had told Eidelman not to tell Lessans anything about it. The revelation shocked Lessans. Complaint, ¶ 45.

Late in the evening of July 23rd, Eidelman sent an e-mail to Lessans. "Thank you for meeting with me this morning to discuss this matter," Eidelman wrote, adding that, "I know that it was very difficult to read that letter." Lessans responded that Cork must have engineered O'Kane's resignation, settlement and confidentiality agreement so that Cork "would not have to deal with a CFO who was questioning his accounting practices and the $450K loan." Eidelman replied that, "As I sit here knowing what I know now, I swear you are right." Complaint, ¶ 46.

G.    A Forensic Investigation Confirmed O'Kane's Information
        And Uncovered The Details Of Cork's Fraudulent Scheme

Invotex, a forensic accounting firm led by Raymond Peroutka, conducted an investigation into Cork's activities. This 2012 investigation confirmed the information that O'Kane had

provided the previous April and revealed the details of Cork's scheme. Among other things, Invotex found that Cork had: (i) caused Commerce to make disbursements to himself which he did not intend to repay; (ii) caused Commerce to make disbursements for his own benefit that he disguised as expenditures for Commerce's business; (iii) falsified copies of the annual audit reports issued by Commerce's outside auditors, which he presented to Lessans as though they were genuine; and (iv) caused false entries to be made in Commerce's books and records to inflate the earnings of Commerce, thereby increasing the amounts paid by Commerce for Cork's bonuses and 5% profits interest and concealing weaknesses and mismanagement in the business operations that he was directing. Complaint, ¶¶ 21- 22.

> H.     Eidelman's Acts and Omissions Allowed Cork to Further
> Pursue His Fraudulent Scheme and Were a Substantial and
> Contributing Factor to the Demise of Commerce

Eidelman's failure to report O'Kane's information about Cork to Lessans ensured that the criminal at the helm of the Company remained unreported to the Company's owners and able to continue the thefts for which he was ultimately indicted. Had Saul Ewing and Eidelman acted as required in response to O'Kane's April 2011 warnings, by alerting Lessans, the additional – and subsequent – fraudulent conduct alleged in the Indictment, as well as the fraudulent conduct uncovered during the investigation after Commerce discharged Cork, would never have been able to take place. Complaint, ¶¶ 47-49. Saul Ewing's and Eidelman's acts and omissions enabled Cork to continue stealing from Commerce and to conceal his theft and other fraudulent activity, as well as the financial instability of the Company, from Lessans, the one person who had the power and authority to stop it. Cork's falsifications concealed more than $1 million in outright thefts and $4.7 million in artificially inflated 2011 profits. Complaint, ¶¶ 50-51.

Had Lessans been made aware of Cork's theft and falsification of Commerce's financial records in April 2011, he would have fired Cork then and there. Commerce would have conducted a thorough investigation of Cork's activities at that time, the same as it did in 2012, and would have discovered the inflated profits that were being misrepresented and operating deficiencies that had been, and were being, concealed by Cork. Commerce would have been able to avoid incurring losses while it was still solvent and would have been able to manage the problems that Cork had caused. Complaint ¶ 52.

Indeed, upon learning of Cork's fraud in June 2012, Commerce, with the assistance of turn-around and restructuring experts, implemented numerous changes in its operations in order to stem losses caused by Cork and return Commerce to profitability. Had those changes been implemented more than a year earlier, the turn-around effort would have succeeded. Complaint, ¶ 52. By the time Cork's fraud scheme was discovered in June 2012, however, it was too late to remedy the damage that Cork had caused to the company. The relationship between Commerce and The Scotts Company, its principal supplier and provider of financing, was irretrievably damaged, and Commerce was unable to recover. Complaint, ¶ 53.

I.      The State Court Action Asserts Four Causes of Action
        Under State Law Against Saul Ewing and Eidelman

Count One of the State Court Action charges Saul Ewing and Eidelman with negligence and legal malpractice. Under State law, Saul Ewing and Eidelman had attorney-client relationships with Plaintiffs Commerce, Commerce Corporation and Lessans and, thus, had duties to act with the utmost good faith and loyalty, including the obligation to make known to Plaintiffs all information that was significant and material to matters that were the subject of the relationship. Saul Ewing and Eidelman breached those duties when they acted in the manner alleged in the State Court Action. Complaint, ¶¶ 59-67.

Count Two of the State Court Action states a cause of action against Saul Ewing and Eidelman for breach of agency contract. As lawyers for Commerce, Commerce Corporation and Lessans, Saul Ewing and Eidelman were parties to an agency contract with the Plaintiffs and, pursuant thereto, maintained a principal/agent relationship with Plaintiffs. Saul Ewing and Eidelman were also in a confidential relationship with Plaintiffs and stood in a fiduciary capacity with respect to their services and duties to Plaintiffs. By acting and failing to act in the manners described in the Complaint, Defendants breached their fiduciary duties and duties of loyalty to Plaintiffs and thereby breached the agency contract. Complaint, ¶¶ 70-74.

Counts Three and Four of the State Court Action, respectively, set forth causes of action for constructive fraud and intentional concealment by Saul Ewing and Eidelman. Saul Ewing and Eidelman had duties to disclose to Plaintiffs, and not to conceal from them, information that was significant and material to matters that were the subject of the relationship, as well as specifically to make known to Plaintiffs, and not to conceal from them, the allegations made by O'Kane about Cork. Complaint, ¶¶ 76-78, 83. Saul Ewing and Eidelman willfully and intentionally committed breaches of the fiduciary duties that they owed to Plaintiffs and engaged in conduct that deceived Plaintiffs and violated the confidences that Plaintiffs reposed in Saul Ewing and Eidelman as their lawyers. Defendants intentionally failed to disclose to Lessans and, indeed, took affirmative steps to conceal from Lessans, O'Kane's warnings about Cork's fraudulent acts. Complaint, ¶¶ 80, 85.

Saul Ewing and Eidelman concealed these material facts from Lessans with the intent to deceive him and the other Plaintiffs. Saul Ewing and Eidelman knew that, if Lessans was made aware of O'Kane's information about Cork, Lessans would have promptly investigated Cork and his actions and, upon learning of Cork's theft and falsification of Commerce's financial records in April 2011, he would have fired Cork at that time. Complaint, ¶ 86.

## THE REMOVAL, ANSWER AND COUNTERCLAIMS

On February 13, 2015, Defendants filed their Notice of Removal. (Adversary Doc. 1). Thereafter, Defendants filed the Answer and Affirmative Defenses by Defendants Saul Ewing and Gary Eidelman on February 19, 2015, in the removed action. (Adversary Doc. 6). On March 12, 2015, the Court granted Defendants' Motion for Leave to File Counterclaims Under Seal (Adversary Doc. 11; *see also* Adversary Doc. 18 dated March 14, 2015), and Defendants' Counterclaims Against Plaintiffs Richard Lessans and Commerce Corporation were filed under seal on March 12, 2015. (Adversary Doc. 12). The Counterclaims assert State law causes of action for contribution and indemnification against Commerce Corporation and Lessans.

## ARGUMENT

### I.   THIS IS A CASE FOR MANDATORY ABSTENTION

The mandatory abstention statute, 28 U.S.C. § 1334(c)(2), requires this Court to abstain from considering the State Court Action. Under section 1334(c)(2), a federal district or bankruptcy court "must abstain" from hearing a case when: "(i) the case is based on state law causes of action, (ii) the case relates to a bankruptcy case but is not a core proceeding, and (iii) the case could not have been commenced in federal court in the absence of the bankruptcy filing and the case can be timely adjudicated in state court." *Global Express Money Orders, Inc. v. Farmers & Merchants Bank (In re Colleen, Inc.)*, 406 B.R. 674, 679 (Bankr. D. Md. 2009) (citing *Hoge v. Moore (In re Railworks Corp.)*, 345 B.R. 529 (Bankr. D. Md. (2006)).

### A.   Defendants Dispute Only One Of The Statutory Elements

Defendants do not deny that the underlying State Court Action is an action for legal malpractice, breach of contract and fraud, based purely upon pre-petition conduct and entirely upon state law causes of action. They also concede that the State Court Action involves Maryland

14

citizens and no federal questions and that it could not have been commenced in the federal court in the absence of the bankruptcy filing.  And, there is nothing to indicate that timely adjudication in the state court is unlikely.[4]  Defendants merely contend, incorrectly, that the State Court Action is a core proceeding.

          B.      The State Court Action Relates To A Bankruptcy Case But
                   Is A Non-Core Proceeding

      While Defendants, in their Notice of Removal, have asserted that the State Court Action is a core proceeding, and therefore not subject to mandatory abstention, they are plainly wrong. Courts find state causes of action to be non-core where the cause of action "was not created by the Bankruptcy Code nor will it be determined under the provisions of the Bankruptcy Code" and "not dependent on [a party] having filed for bankruptcy protection."  *In re Colleen, Inc.*, 406 B.R. at 678-79.  In short, a state cause of action is non-core where, as here, it has "independent existence apart from the bankruptcy case."  *Id.* at 679 (citing *Valley Historic L.P. v. Bank of New York*, 486 F.3d 831 (4th Cir. 2007)).  The primary reason for finding such causes of action to be non-core, and requiring abstention under such circumstances, is that "'Congress may not force non-consenting claimants whose claims are based on state-created private rights into non-Article III courts.'"  *Porter-Hayden Co. v. First State Management Group, Inc. (In re Porter-Hayden Co.)*, 304 B.R. 725, 730-31 (Bankr. D. Md. 2004) (citing *Humboldt Express Inc. v. The Wise Co., Inc.*

---

[4] The party opposing mandatory abstention bears the burden on the "timely adjudication" requirement of mandatory abstention.  *Power Plant Entmt Casino Resort Indiana, LLC v. Mangano*, 484 B.R. 290, 298-99 (Bankr. D. Md. 2012): "[T]his Court determines that the better view is that there is a presumption that the state courts operate timely and efficiently and the party seeking abstention is not required to affirmatively prove this facet of the abstention test in the absence of evidence from the opposing party.  In the instant case, because neither party offered evidence with respect to the ability of the state court to timely adjudicate this case, the Court will apply the presumption that the state court is capable.  Because other elements of mandatory abstention have been met, this court must abstain, and send the case back to state court."

*(In re Apex Express Corp.)*, 190 F.3d 624, 632 (4th Cir.1999); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70–72 (1982)). *Valley Historic Ltd. P'ship*, 486 F.3d at 836 ("It seems self-evident that a claim, like the Debtor's breach of contract claim, that predates the filing of the chapter 11 case cannot be said to have arisen within that case, and whether it caused the bankruptcy is immaterial.").

In fact, the Court of Appeals for the Fourth Circuit and the Bankruptcy Court for this District have consistently treated proceedings based on prepetition conduct and grounded in state law as being non-core. *In re Porter-Hayden Co.*, 304 B.R. at 730-31 (citing *In re Apex*, 190 F.3d at 631-32; *Beard v. Braunstein*, 914 F.2d 434, 444–45 (3d Cir.1990); *National Enterprises, Inc. v. The Koger Partnership, Ltd. (In re National Enterprises, Inc.)*, 128 B.R. 956, 960 (E.D. Va. 1991)). *See also Power Plant Entm't Casino Resort Indiana, LLC v. Mangano*, 484 B.R. 290, 294 (Bankr. D. Md. 2012) (claims for prepetition tortious interference, civil conspiracy, false light invasion of privacy and defamation); *In re Colleen, Inc.*, 406 B.R. at 678-79 (claim for prepetition conversion); *Wilkins v. Bolar Pharmaceutical Co., Inc. (In re Pharmakinetics Labs., Inc.)*, 139 B.R. 350, 351 (D. Md. 1992) (adopting recommendation of Judge Schneider that complaint against debtor alleging fraud, conspiracy, negligence and breach of express and implied warranties in the testing and FDA approval of drug products and seeking a money judgment is a non-core proceeding; remanding on equitable ground due to absence of other mandatory abstention factors).[5]

---

[5] *See also In re Cent. Ill. Energy, L.L.C.*, No. 07-82817, 2010 WL 2491019, at *3 (Bankr. C.D. Ill. June 16, 2010) ("It is also clear that debtor's claim of legal malpractice against nonbankruptcy counsel for advice, acts or omissions that occurred pre-petition and pertained only to a nonbankruptcy issue, only falls within 'related to' jurisdiction, even though the claim is an asset of the estate that a bankruptcy trustee could prosecute for the benefit of creditors as a non-core proceeding."); *Lowenbraun v. Frentz (In re Lowenbraun)*, 313 B.R. 408 (Bankr. W.D. Ky. 2004) (State court malpractice claim against attorney who allegedly negligently represented debtor's former wife in adversary proceeding against debtor satisfied criteria for mandatory abstention; "Malpractice is a state law tort no matter the forum in which the alleged malpractice may have

C.    There Is No Core Jurisdiction Under 28 U.S.C. § 157(b)(2)(c)

Defendants attempt to characterize the State Court Action as a counterclaim to Saul

Ewing's $25,000 Proof of Claim as a basis to assert core jurisdiction under 28 U.S.C.

§157(b)(2)(c). At the same time, however, Defendants maintain that the State Court Action is a

*Stern* counterclaim, *i.e.*, one that would not necessarily be resolved by an adjudication of the Saul

Ewing Proof of Claim, and that, therefore, the Bankruptcy Court lacks core jurisdiction to

adjudicate the State Court Action. Notice of Removal at ¶23, n.2. *See Stern v. Marshall*, 131 S.

Ct. 2594, 2617 (2011). If the State Court Action is a *Stern* counterclaim, as Defendants suggest,

it cannot be regarded as a core proceeding under § 157(b) because the Supreme Court has held that

§ 157(b) cannot constitutionally be applied to *Stern* claims. *Stern*, 131 S. Ct. at 2611, 2616.

Most recently, in *Exec. Bens. Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014), the

Supreme Court reiterated that *Stern* claims, even if denominated counterclaims, cannot be labelled

core proceedings under § 157(b) but, instead, must be recognized as non-core proceedings

governed by § 157(c). After the decision in *Stern*, the lower federal courts had expressed

uncertainty as to whether a *Stern* claim should be regarded as either non-core, as some suggested,

or as outside the bankruptcy statutory scheme, altogether. Resolving that dispute, the Supreme

Court held:

> When a court identifies a claim as a *Stern* claim, it has *necessarily
> "held invalid" the "application" of 157(b) - i.e., the "core" label
> and its attendant procedures - to the litigant's claim.* Note

---

occurred."); *Kmart Creditor Trust v Conawa (In re Kmart Corp.*, 307 B.R. 586, 593 (Bankr. E.D.
Mich. 2004) (mandatory abstention; professional malpractice suit against debtor's accountant was
non-core where "majority of the allegations made in the Trust's state court Complaint deal with
pre-petition conduct, and the breach of contract claims relate to contracts that were entered into
pre-petition."); *Diamond Mortg. Corp. of Illinois v. Sugar,* 913 F.2d 1233 (7th Cir. 1990) (claim
for malpractice against attorneys who represented debtor prepetition and involving prepetition
conduct did not arise under title 11 and was non-core, despite contention that the malpractice
caused the debtors' insolvency).

> following § 151. In that circumstance, the statute instructs that "the
> remainder of th[e] Act ... is not affected thereby." *Ibid.  That*
> *remainder includes § 157(c), which governs non-core proceedings.*
> With the "core" category no longer available for the *Stern* claim at
> issue, we look to § 157(c)(1) to determine whether the claim may be
> adjudicated as a non-core claim - specifically, whether it is "not a
> core proceeding" but is "otherwise related to a case under title 11."

*Arkison*, 134 S. Ct. at 2173 (emphasis added). In other words, in cases concerning *Stern* claims,

"the 'application' of both the 'core' label and the procedures of § 157(b) to the trustee's claims

has therefore been 'held invalid,'" *id.* at 2174, and "[t]he statute permits *Stern* claims to proceed

as non-core within the meaning of § 157 (c)." *Id.* at 2173.

While there have been no cases in this District that apply *Arkison*, one Judge of this District,

in an opinion prior to *Arkison*, observed that, even under the narrowest reading of the *Stern* case,

"courts view *Stern* as invalidating ... Section 157(b)(2)(c) concerning counterclaims by the estate

filed against persons filing claims against the estate." *Albert v. Site Management, Inc.*, 506 B.R.

453, 458 (D. Md. 2014) (Chasanow, J.). In light of *Arkison*, moreover, and in view of Defendants'

acknowledgment that the State Court Action, if it is a counterclaim at all, is a *Stern* counterclaim,

the State Court Action must be deemed to be a non-core proceeding under Section 157(c)(1). And,

since it is non-core, the final requirement for mandatory abstention under 28 U.S.C. § 1334 (c)(2),

is met.[6]

---

[6] One bankruptcy judge, declining to acknowledge that Section 157(b)(2)(c) is invalid in the case
of a *Stern* claim, has refused to abstain on the ground that the section may nevertheless be applied
to label a *Stern* claim as core. *Residential Funding Co., LLC v. UBS Real Estate Sec., Inc. (In re*
*Residential Capital, LLC)*, 515 B.R. 52, 56 (Bankr. S.D.N.Y. 2014). By giving effect to a statutory
section that is constitutionally invalidated, and applying a label that the Supreme Court has
declared inapplicable, the decision is plainly wrong. *See Arkison*, 134 S. Ct. at 2173-4.

D.   Defendants Cannot Convert The Non-Core State Court Action Into Core Proceedings By Raising Complaints About The Separate Proceedings Authorizing The Employment Of Counsel Pursuant To 11 U.S.C. §§ 327 and 328

Defendants, in their Notice of Removal, contend that this Court should treat the State Court Action as a core proceeding because Defendants now seek to raise complaints about the disclosures that were made by the Trustee and counsel when this Court, in an entirely separate proceeding, authorized the employment of special counsel for the Trustee pursuant to 11 U.S.C. §§ 327 and 328. Plaintiffs address Defendants' complaints about the employment of counsel in a later section of this Memorandum. For purposes of the mandatory abstention analysis, however, it should suffice to say that the proceedings concerning the employment of counsel are not part of the State Court Action. And, significantly, Defendants have not cited a single case in which a defendant was able to change a non-core state court action into a core proceeding by asserting defects in the authorization for employment of counsel for the Trustee. If it were otherwise, every State court proceeding in which counsel were retained could be made into a core proceeding as issues under §§ 327 and 328 concerning retention and payment of counsel could always be raised collaterally.

The fact that this Court, in a separate proceeding, previously entered an Order authorizing the employment of special counsel for the Trustee, and retains jurisdiction with respect to that Order, does not convert the State Court Action into a core proceeding or otherwise enlarge the jurisdiction of the Court over the State Court Action. In a case involving circumstances far more favorable to Defendants than those present here, *SunTrust Bank v. Roberson (In re Baseline Sports, Inc.)*, 393 B.R. 105, 120 (Bankr. E.D. Va. 2008), plaintiffs entered into a bankruptcy court approved settlement agreement under which plaintiffs released certain claims in exchange for being granted a relief from stay to pursue collection on accounts receivable. When it turned out that the value of the accounts receivables was less than what the plaintiffs expected, they sued the

19

chapter 11 debtor and its principals in bankruptcy court for fraudulent inducement, conspiracy and breach of fiduciary duty.  Though the bankruptcy court had previously entered an Order approving the settlement agreement that was the basis of the action, the bankruptcy court dismissed the case for lack of *any* subject matter jurisdiction because "SunTrust's claims *against the Defendants* are not the type of administrative matters which could only happen, by their nature, in a bankruptcy case." *Id.* at 125 (emphasis added).  As the court explained:

> Simply because the Court retains jurisdiction to interpret its own order, however, does not necessarily vest the Court with subject matter jurisdiction to hear any litigation between the parties that are subject to that order.  In other words, a bankruptcy court will likely have jurisdiction to interpret its own order to determine whether a party may bring a suit, but *the court must possess an independent jurisdictional basis to adjudicate that litigation in the bankruptcy court*.

*Id.* at 120 (emphasis added) (citing *C.F. Trust, Inc. v. Tyler*, 318 B.R. 795, 804 (E.D. Va. 2004)).

Here, too, the separate order authorizing the employment of special counsel for the Trustee cannot be grafted onto the State Court Action to convert it into a core proceeding.  The State Court Action, itself, is not a core proceeding; it does not "arise under" title 11 because the cause of action or substantive right claimed is not created by the Bankruptcy Code; and it does not "arise in" the bankruptcy case because it would have existence outside the bankruptcy.  *Valley Historic Limited Partnership,* 486 F.3d at 835; *Allnut v. Associates Leasing, Inc. (In re Allnut)*, 220 B.R. 871, 884 (Bankr. D. Md. 1998); *In re Colleen, Inc.*, 406 B.R. at 678-9.  The State Court Action is distinct from the proceedings for the employment of special counsel, and the Defendants have neither authority nor reason sufficient to justify the use of the latter as the basis for elevating the former to a core proceeding.

E.    The State Court Proceeding Is Not A Core Matter Under The
      Catch-All Provisions Of 28 U.S.C. § 157(b)(2)(O)

Defendants stretch the bounds of credulity when they attempt to use the catch-all provision

of 28 U.S.C. § 157(b)(2)(O) to argue that the State Court Action is core. Notice of Removal ¶ 23.

That subsection lists "proceedings affecting the liquidation of the assets of the estate or the

adjustment of the debtor-creditor or the equity security holder relationship" as core. 28 U.S.C. §

157(b)(2)(O). Courts understand that Sections 157(b)(2)(A) and 157(b)(2)(O) are merely "catch-

all provisions" that are to be read very narrowly. *See Bethlahmy v. Kuhlman (In re ACI-HDT

Supply Co.)*, 205 B.R. 231, 236 (B.A.P. 9th Cir. 1997) (holding "state law contract claims that do

not specifically fall within the categories of core proceedings enumerated in 28 U.S.C. §

157(b)(2)(B)–(N) are [non-core] related proceedings under § 157(c) even if they arguably fit

within the literal wording of the two catch-all provisions, sections § 157(b)(2)(A) and (O)").

By characterizing the State law allegations of the Complaint and Counterclaim as matters

affecting the liquidation of the assets of the estate, or as adjusting debtor-creditor relationships,

Defendants engage in precisely the type of "broad reading of the literal terms of the statutory text

that could lead to the result that courts treat just about every dispute as 'core,'" a result that the

Fourth Circuit has flatly rejected. *In re Apex,* 190 F.3d at 631. *See also*: *Wood v. Wood (Matter

of Wood)*, 825 F.2d 90, 95 (5th Cir. 1987) ("We decline, however, to give such a broad reading to

subsection 157(b)(2)(O); otherwise, the entire range of proceedings under bankruptcy jurisdiction

would fall within the scope of core proceedings, a result contrary to the ostensible purpose of the

1984 Act.").

It is even doubtful whether this case could be said to fall within the "literal terms" of

§157(b)(2)(O). The Complaint alleges causes of action for negligence-legal malpractice, breach

of contract, constructive fraud and intentional concealment. These claims have no bearing on the

21

liquidation of the assets of the estate, the debtor-creditor relationship or the equity-security holder relationship.  The Counterclaims asserted by Defendants for contribution and indemnification against non-debtors Lessans and Commerce Corporation, likewise, do not affect the liquidation of assets, debtor-creditor or equity-security relationships.  Aside from Defendants' using the same allegations to assert contributory negligence against the Plaintiffs and the Counterclaims against Commerce Corporation and Lessans, the only relationship that would be affected by the Counterclaims is the relationship between *Saul Ewing* and Eidelman, on the one hand, and *Lessans* and *Commerce Corporation*, on the other.

The State Court Action has a bearing on the bankruptcy estate only because the Trustee is seeking a recovery that would augment the Estate, and Defendants are attempting to defeat that recovery by contending that the Debtor, through actions that they attribute to Commerce Corporation and Lessans, was contributorily negligent.  Arguments that actions, if successful, will augment the size of the estate are not of themselves sufficient for courts to find the actions to be core.  *See In re Stone & Webster, Inc.*, 367 B.R. 523, 529 (Bankr. D. Del. 2007) ("the prospect that a claim may provide economic benefit to the estate does not factor into the determination of whether a claim is core or non-core."); *Garner v. BankPlus*, 470 B.R. 402, 407 (S.D. Miss. 2012) ("plaintiffs' claims in this cause are not core simply because they are an asset of the bankruptcy estates"); *see also In re Jacobs*, 401 B.R. 202, 205 (Bankr. D. Md. 2008) (Schneider, J.) ("'the test for determining whether a civil proceeding is "related to" bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'") (quoting *Owens–Ill., Inc. v. Rapid Am. Corp. (In re Celotex Corp.),* 124 F.3d 619, 625 (4th Cir. 1997)).

II.    **THIS COURT, IN THE EXERCISE OF ITS DISCRETION, SHOULD ABSTAIN FROM THE STATE COURT ACTION PURSUANT TO 28 U.S.C. § 1334(C)(1)**

This Court should also exercise discretionary or permissive abstention pursuant to 28 U.S.C. § 1334 (c)(1). That Section provides that, "Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." *Id.*

A.    The Courts Have Identified Various Factors In Determining Whether To Exercise Permissive Abstention

While the statute provides generally for permissive abstention "if the interests of justice or if considerations of comity warrant abstention," *In re Railworks Corp.*, 345 B.R. at 540, courts have considered various factors in assessing whether abstention is in the interest of justice. Judges in this District have listed twelve factors as appropriate for consideration in deciding whether to grant permissive abstention. *MacLeod v. Dalkon Shield Claimants Trust*, 967 F.Supp. 856, 858 (D. Md. 1997); *Porter-Hayden Co. v. First State Mgmt. Group, Inc.*, 304 B.R. 725, 735 (Bankr. D. Md. 2004); *In re Coleen, Inc.*, 406 B.R. at 679-80 (Alquist, J.); *Power Plant Entm't*, 484 B.R. at 299.

The twelve factors are: (1) efficient administration of the Debtor's estate; (2) the extent to which State law issues predominate over bankruptcy issues; (3) whether the issues involve difficult or unsettled questions of State law that would be better addressed by a State court; (4) the presence of a related proceeding commenced in State court; (5) the existence of a jurisdictional basis other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing State law claims from core bankruptcy matters to allow judgments to be

23

entered in State court; (9) the burden of the federal court's docket; (10) the likelihood that the commencement of the proceeding in federal court involved forum shopping by one of the parties; (11) the existence of a right to jury trial; and (12) whether non-debtor parties are involved in the proceeding. *Id.*

In any given case, the court may find that certain factors are "most relevant" and deserve greater weight than others. *In re Porter-Hayden Co.*, 304 B.R. at 735-36. As one court has observed, "The factors should be applied on a case by case basis with no one factor necessarily determinative." *Barge v. Western Southern Life Insurance Company*, 307 B.R. 541, 547 (S.D.W. Va. 2004).

> B.    The Factors In This Case Weigh Heavily In Favor Of Abstention

The factors weigh heavily in favor of abstention. The State Court Action is a suit for pre-petition malpractice and other wrongs. The Complaint, Answer and Counterclaims rest entirely on Maryland law. Abstention will permit the State Court Action to be resolved, and the value of the Trustee's causes of action to be quantified and liquidated, in a jury trial in the forum of the Plaintiffs' choosing. All of this will be accomplished without taxing the resources of the Bankruptcy Court or imposing upon the already burdened District Court.

> (1)    Efficient Administration of the Debtor's Estate

Abstention will promote the efficient administration of the Debtor's estate. As the Court observed in *Power Plant Entm't*, 484 B.R. at 299-300, "it is not uncommon for a claim to be liquidated in state court," and "[l]iquidating the underlying claim in the bankruptcy court will not make the bankruptcy case more efficient." *See also Houston Baseball Partners LLC v. Comcast Corporation (In re Houston Regional Sports Network)*, 514 B.R. 211, 215-16 (Bankr. S.D. Tex. 2014) (administration of Debtor's estate "supports abstention" to permit State court to resolve suit

24

for pre-petition fraud, breach of contract and civil conspiracy); *Barge*, 307 B.R. at 547 (no adverse effect upon administration of debtor's estate when bankruptcy court abstains to permit resolution of debtor's State court action for pre-bankruptcy fraud and negligence).

> (2)     Extent To Which State Law Issues Predominate Over Bankruptcy Issues

The issues in the State Court Action are purely issues under State law. The complaint avers causes of action, all under Maryland law, for professional negligence malpractice, breach of agency agreement, constructive fraud and intentional misrepresentation. Defendants' Answer, which they filed after the case was removed to this Court, takes issue with the facts averred in the Complaint and alleges sixteen State law affirmative defenses, including contributory negligence, assumption of risk, lack of standing and intervening/superseding causation. Defendants' Counterclaims, likewise filed after removal, contain five counts against Lessans and Commerce Corporation for contribution and indemnification under Maryland common law.

> (3)     Whether The Issues Involve Difficult Or Unsettled Questions of State Law That Would Be Better Addressed By A State Court

While the issues may not be legally complex, they are better addressed by the State court because they arise from a complex and highly disputed factual record and involve pre-petition professional malpractice. As the Court stated in *Power Plant Entm't*, "the parties undoubtedly rely on a complex, extensive and in all likelihood, disputed factual record. A state court is best suited to apply its knowledge and expertise of its legal standards in such circumstances." 484 B.R at 300. In fact, the State court is particularly suited to decide important questions arising in a cause of action against professionals and "the limits of their shield from their involvement in client activities." *In re Kohner*, No. 2:13-BK-02159-DPC, 2014 WL 4823791, at *6 (Bankr. D. Ariz.

Sept. 25, 2014). Moreover, the issues that Defendants have raised in their Counterclaims concern State law issues of contribution and indemnification.

> (4)   The Presence Of A Related Proceeding Commenced In State Court

There are no related proceedings pending in State court or in any other forum. Accordingly, this factor is neutral. *See In re Canfibre of Riverside, Inc.*, No. 00-4019, 2006 WL 2130664, at *2 (Bankr. D. Del. July 20, 2006) (this factor is neutral where "Neither party has indicated that there are other proceedings pending in any other forum.").

> (5)   The Existence Of A Jurisdictional Basis Other Than § 1334

There is no disputing that § 1334 is the only jurisdictional basis that allows this case to be brought to the United States Bankruptcy Court. There is no diversity of citizenship because Plaintiffs and Defendants are all Maryland residents. Furthermore, neither the Complaint nor the Answer and Counterclaims assert any federal cause of action or defense.

> (6)   The Degree of Relatedness Or Remoteness Of The Proceeding To The Main Bankruptcy Case

The State Court Action is a suit for pre-petition malpractice committed by the attorneys who represented the Debtor, the corporation that is its sole member and the majority owner of the corporation. The facts asserted by the respective parties, and the legal claims and defenses asserted by them, are all remote from the main bankruptcy case.

While one of the Defendants has filed a proof of claim in the bankruptcy case for $25,000 in unpaid bills for services rendered during the two months preceding the initial bankruptcy filing, Defendants themselves have acknowledged that the proof of claim and the State Court Action are sufficiently unrelated and that the State Court Action should be resolved by jury trial and not as a

part of the Bankruptcy Court's claims process. Notice of Removal at ¶¶ 23 (n.2), 30, 31. Abstention by this Court will provide Defendants with a forum in which they will receive a jury trial.

>          (7)    The Substance Rather Than The Form Of An
>                 Asserted "Core" Proceeding

The State Court Action is, in substance, a suit by former clients of a law firm, averring State law causes of action for legal malpractice and other wrongs committed prior to the filing of the bankruptcy case. Defendants, for their part, rely upon State law for their Affirmative Defenses and Counterclaims. As noted earlier in this Memorandum, proceedings of this type are typically regarded as non-core.

>          (8)    The Feasibility Of Severing State Law Claims From
>                 Core Bankruptcy Matters To Allow Judgment To Be
>                 Entered In State Court

The State Court Action consists solely of causes of action, defenses and counterclaims under Maryland law. Since they are separate and apart from any core bankruptcy matters that may be considered in the administration of the bankruptcy case, there is no doubt as to the feasibility of allowing the State Court Action to resume in the State court in which it was brought.

>          (9)    The Burden Of The Federal Court's Docket

The District Court, in which the Defendants would have the State Court Action tried by a jury, is already overburdened. The Administrative Office of the United States Courts reports that the *median time* interval from filing to completion of jury trial in the District, for the 12-month period ending September 30, 2014, was *33.3 months*, an interval of nearly three years. <http://www.uscourts.gov/Statistics/JudicialBusiness/2014/statistical-tables-us-district-courts-trials.aspx, Table T-3> (last visited March 15, 2015).

27

By enabling the case to return to the Circuit Court for Baltimore City, this Court will free itself and the District Court of the burden of managing a contentious dispute in a case containing a complex and extensive record. *Power Plant Entm't*, 484 B.R. at 300. There is no reason to believe that the State court cannot manage the State Court Action and bring it to a timely conclusion.

> (10)    The Likelihood That The Commencement Of The Proceeding In Federal Court Involves Forum Shopping By The Defendants

Defendants' removal is an outright effort at forum shopping. Plaintiffs, who are the Trustee of the bankruptcy Estate and two non-Debtors, filed the State Court Action, seeking a jury trial, in the State court for the jurisdiction in which the Defendants maintain their offices and conduct their business. In an effort to deprive Plaintiffs of their choice of forum, Defendants invoke bankruptcy jurisdiction to remove the case to Bankruptcy Court but, at the same time, ask for a jury trial in the District Court.

Defendants' effort to work the State Court Action into federal court, where there is no diversity or federal question jurisdiction, is undeniably for the purpose of obtaining a forum more to Defendants' liking. *See Stoe v. Flaherty*, 436 F.3d 209, 214 (3d Cir. 2006), *as amended* (Mar. 17, 2006) (remanding on equitable grounds; "a party who wishes to litigate a state claim in a state court, but finds himself in a federal court solely because the controversy is related to a bankruptcy, should be able to insist upon a state adjudication if that will not adversely affect the bankruptcy proceedings."); *In re NE Opco, Inc.*, No. 13-11483 CSS, 2014 WL 4346080, at *2 (Bankr. C.D. Cal. Aug. 28, 2014) ("Plaintiff commenced the action in state court. . . . the fact that the action was removed does not mean the court can ignore where it was commenced.").

(11)   <u>The Existence Of A Right To Jury Trial</u>

The parties are entitled to a jury trial in the State Court, and, if, as Defendants contend, the causes of action are *Stern* claims, Defendants would be entitled to a jury trial in federal court as well.  Since the right to jury trial in State court is undeniable, and does not depend upon further analysis, this factor would favor jury trial in State court.  *Cf. Power Plant Entm't*, 484 B.R. at 301 (citing *In re Merry-Go-Round*, 222 B.R. 254 (D. Md. 1998)).

(12)   Whether Non-Debtor Parties Are Involved In The Proceeding

Two Plaintiffs, Commerce Corporation and Lessans, are non-Debtor parties who have chosen to have their rights determined in State court.  Eidelman, one of the Defendants, does not claim to have any rights against the bankruptcy estate but has joined in the Removal as part of Defendants' effort to move the State Court Action to a federal forum.

As this factor-by-factor analysis shows, virtually all of the factors strongly favor abstention while one or two are neutral.  It clearly appears from this analysis that it is "in the interest of justice, ... in the interest of comity with State courts [and] respect for State law" that this Court abstain from hearing the State Court Action.  28 U.S.C. § 1334(c)(1).

## III.   EQUITABLE REMAND OF THE STATE COURT ACTION IS ALSO APPROPRIATE

This Court should also Remand the State Court Action on equitable grounds.  Defendants removed the State Court Action to this Court pursuant to 28 U.S.C. § 1452 (a).  Subsection (b) of that statute provides further, however, that, "The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground."  *Id.*

In *In re Coleen, Inc.*, 409 B.R. at 682-83, the Court abstained on mandatory and discretionary bases and also remanded the case on equitable grounds, stating that:

> Virtually the same (if not the identical) factors have emerged for judging the propriety of equitably remanding an action pursuant to § 1452 (b) as are utilized for determining the propriety of permissive abstention under § 1334 (c)(1). *In re Merry-Go-Round Enterprises, Inc.*, 222 B.R. 254, 256 (D. Md. 1998).

The Court went on to observe that, "Notwithstanding, every remand decision does not need to be justified under abstention law because remand may be ordered on any equitable ground." *Id.* at 683. *See also Martz Painting Contrs., LLC v. Kolius (In re Masterbuilt Cos.)*, 458 B.R. 725, 729 (Bankr. D. Md. 2011) ("a claim may be remanded 'on any equitable ground,' *i.e.*, as interpreted by some courts, 'any appropriate ground'") (citing *Merry-Go-Round*, 222 B.R. at 256).

Here, the Court need not range beyond the twelve-factor test because, as discussed in the preceding section of this Memorandum, the factors weigh heavily in favor of returning the State Court Action to the State court in which it originated. Accordingly, the Court should remand the case to the Circuit Court for Baltimore City on equitable grounds.

It should also be remembered that, "When ruling on a motion for remand, courts construe all doubts in favor of remand." *Kmart Creditor Trust v. Conaway (In re Kmart Corporation*, 307 B.R. 586, 590 (Bankr. E.D. Mich. 2004).

IV.    **WHILE DEFENDANTS' COMPLAINTS ABOUT THE ENGAGEMENT OF SPECIAL COUNSEL FOR THE TRUSTEE HAVE NO PLACE IN THE CONSIDERATION OF ABSTENTION OR REMAND OF THE STATE COURT ACTION, DEFENDANTS HAVE MADE ASSERTIONS ABOUT THE ENGAGEMENT THAT SHOULD NOT GO UNANSWERED**

As previously addressed in this Memorandum, this Court's authorization for the engagement of counsel, and the disclosures made therewith, may be appropriate for consideration in the main bankruptcy case, but they should not be considered here in connection with

Defendants' Removal or Plaintiffs' Motion for Abstention and/or Remand. Defendants have not cited any authority for the proposition that a State court action by a bankruptcy Trustee may be removed to federal court because a defendant claims that there was a flaw in the selection of Trustee's counsel.

Nevertheless, Defendants' Notice of Removal makes various assertions of fact and law that should not go unanswered. *First*, throughout 2014, in the course of various communications, undersigned counsel made Saul Ewing and Eidelman aware of that fact that they were conducting an investigation on behalf of not only the Trustee, but also Commerce Corporation and Lessans. On four separate occasions, undersigned counsel dealt with counsel for Saul Ewing on behalf of all three Plaintiffs in connection with the preparation and execution of tolling agreements. (Exhibits "C," "D," "E" and "F" hereto). And, on two of those occasions, on or about September 15 and November 17, 2014, William J. Murphy, Esq., signed tolling agreements on behalf of "Saul Ewing and its attorneys," and Aron U. Raskas, one of undersigned counsel, signed on behalf of all three Plaintiffs. (Exhibits "E" and "F" hereto).

*Second*, on December 10, 2014, when the Trustee filed his Amended Application for Expanded Authority to Employ Special Counsel for Trustee on Contingent Fee Basis, and attached the Verified Statement of Counsel, Saul Ewing knew the full extent of special counsel's representation. Despite receiving notice of the filing (*See* Exhibit "G" hereto), Saul Ewing did not call attention to errors in the Application and Verified Statement and, most importantly, did not otherwise object to the Application. 11 U.S.C. § 327(c).

*Third*, Defendants complain about the employment of special counsel but fail to address 11 U.S.C. § 327(c), the subsection that governs the employment of special counsel and pursuant to which both the Application and Amended Application were made. *See* Application for

31

Authority to Employ Special Counsel (Doc. 195) and Amended Application for Expanded Authority to Employ Special Counsel (Doc. 464) ("Zvi Guttman, Trustee, applies for the amendment of authority to employ special litigation counsel pursuant to 11 U.S.C. § 327(c) and 328(a) ..."). Defendants rely, instead, on subsection (a), which does not apply. Notice of Removal, ¶¶ 14-18.

Section 327(a), which Defendants have cited, generally prohibits the employment of a person who either holds *or* represents an interest adverse to the estate. "Yet, § 327(c), which governs the employment of an attorney or professional who represents a creditor, creates a limited exception to this general rule." *In re Johnson*, 312 B.R. 810, 819-20 (E.D. Va. 2004) (footnotes and citations omitted). "Pursuant to that provision, an attorney who represents a creditor is validly employed by the trustee provided that there is no actual conflict of interest between the attorney's representation of the creditor and his representation of the trustee." *Id.* "Thus, where a trustee employs a professional who represents a creditor, the stringent two-pronged test set forth in § 327(a) does not apply." *Id.* at 820. "Put differently, a trustee may employ a creditor's attorney under § 327(c) provided the dual representation presents no actual conflict of interest. And, this is so even if there exists a potential conflict of interest or an appearance of a conflict of interest that would otherwise disqualify the attorney from employment under § 327(a)." *Id.* (footnote omitted).[7]

---

[7] The *Johnson* court further observed that:

> "(I)t follows that by allowing a trustee to retain a creditor's attorney provided there is no actual conflict of interest, § 327(c) carves out an exception to the broad requirements of § 327(a) that is limited to creditor's attorneys. And, legislative history confirms that this is precisely what Congress intended to accomplish by enacting § 327(c).... . *See* 3 *Collier on Bankruptcy* ¶ 327.04[7][b]. Section 327(c) was intended to broaden the trustee's choices to include these attorneys provided there was no "actual conflict of interest."

*In re Johnson*, 312 B.R. at 820-21.

Cases from other courts are to the same effect. *See In re Hanckel*, 517 B.R. 609, 613 (Bankr. D.S.C. 2014) ("Congress created an exception to § 327(a)'s general rule in subsection (c), which provides that a professional person is not disqualified 'solely because of such person's employment by or representation of a creditor.'"); *In Re Worldwide Wholesale Lumber, Inc.,* 364 B.R. 197, 202-03 (Bankr. D.S.C. 2006) ("Section 327(c) provides that a person is not disqualified for employment solely because of such person's employment by or representation of a creditor, unless another creditor or the United States Trustee objects."). *In re Byrd*, 2006 WL 4458680, at *1-2 (Bankr. D. Md. Dec. 12, 2006) (Order by Court holding that law firm "also would qualify for employment under 11 U.S.C. § 327(a) because, pursuant to 11 U.S.C. § 327(c), no actual conflict exists as a result of Shulman Rogers' prior representation of Platinum Financial Services Corporation and no creditor or the United States Trustee has objected to Shulman Rogers' retention"). Consequently, the conflict "must be direct and actual;" an attorney is not to be disqualified "solely because there is an appearance of a conflict;" and "the burden of proving an actual conflict lies on the objecting party." *In re Hanckel*, 517 B.R. at 614.

*Fourth*, the interest of the Trustee and the other Plaintiffs coincide, and there is no actual conflict among the Plaintiffs. Defendants make the same allegations about Commerce Corporation and Lessans to defeat the causes of action of all of the Plaintiffs on the grounds of contributory negligence and assumption of risk. They also repeat those allegations in their Counterclaims against Commerce Corporation and Lessans. All of the Plaintiffs, therefore, have a common interest in challenging Defendants' assertions and in establishing that the conduct of Commerce Corporation or Lessans could not have been the proximate cause of Plaintiffs' losses.

And *fifth*, the Trustee and special counsel have filed an Amended Disclosure and Amended Verified Statement of Counsel to supplement the record and correct their inadvertent failure to

state that special counsel was also representing Commerce Corporation and Lessans in the investigation. (Doc. 489). Out of an abundance of caution, moreover, they have withdrawn their appearances on behalf of those two Plaintiffs (Adversary Docs. 14, 15, 17). Those plaintiffs are now represented by other counsel. (Adversary Doc. 13).

## CONCLUSION

For the reasons set forth above, Zvi Guttman, Chapter 7 Trustee for the Bankruptcy Estate of Commerce LLC, respectfully submits that this Court should: (a) abstain from hearing the State Court Action pursuant to the mandatory abstention provisions of 28 U.S.C. § 1334 (c)(2); (b) abstain from hearing the State Court Action pursuant to the permissive abstention provisions of 28 U.S.C. § 1334 (c)(1); and (c) remand the State Court Action to the Circuit Court for Baltimore City, the forum in which it originated, on equitable grounds pursuant to the provisions of 28 U.S.C. § 1452 (b).

Respectfully submitted,

Dated: March 16, 2015

_____/s/_____
Arnold M. Weiner (Bar No. 01605)
Aron U. Raskas (Bar No. 04393)
Barry L. Gogel (Bar No. 25495)
Rifkin Weiner Livingston Levitan & Silver, LLC
2002 Clipper Park Road, Suite 108
Baltimore, Maryland 21211
Tel: (410) 769-8080
Fax: (410) 769-8811

*Attorneys for Plaintiff Zvi Guttman, Chapter 7 Trustee for
the Bankruptcy Estate of Commerce, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of March, 2015, copies of the within

Memorandum In Support Of Motion Of Zvi Guttman, Chapter 7 Trustee, Plaintiff, For Abstention

And/Or Remand were served via electronic filing and first class mail, postage prepaid, upon:

Steven A. Allen, Esq.
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, Maryland  21204

*Attorneys for Plaintiffs Commerce Corporation*
 *and Richard J. Lessans*

William J. Murphy, Esq.
Conor O'Croinin, Esq.
Adam B. Abelson, Esq.
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland  21202

*Attorneys for Defendants*
*Saul Ewing LLP and Gary Eidelman*

/s/
Arnold M. Weiner (Bar No. 01605)

35