**EXHIBIT "A"**

RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY

2015 JAN 14  PM 12: 02

CIVIL DIVISION

Circuit Court for  Baltimore City
_____
City or County

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

**DIRECTIONS:**
    *Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court *unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a). A copy must be included for each defendant to be served.*
    *Defendant:* You must file an Information Report as required by Rule 2-323(h).
    **THIS INFORMATION REPORT CANNOT BE ACCEPTED AS AN ANSWER OR RESPONSE.**

FORM FILED BY: ☒ PLAINTIFF ☐ DEFENDANT    CASE NUMBER _____
                                                    (Clerk to insert)

CASE NAME: Zvi Guttman, Chap. 7 Trustee, etc.    vs.    Saul Ewing, LLP, et al.
                         Plaintiff                                                Defendant

JURY DEMAND: ☒ Yes ☐ No    Anticipated length of trial: _____ hours or __6__ days
RELATED CASE PENDING? ☐ Yes ☒ No   If yes, Case #(s), if known: _____

Special Requirements? ☐ Interpreter (Please attach Form CC-DC 41)
                       ☐ ADA accommodation (Please attach Form CC-DC 49)

| NATURE OF ACTION (CHECK ONE BOX) | | DAMAGES/RELIEF | |
|---|---|---|---|
| **TORTS** | **LABOR** | **A. TORTS** | |
| ☐ Motor Tort | ☐ Workers' Comp. | **Actual Damages** | |
| ☐ Premises Liability | ☐ Wrongful Discharge | ☐ Under $7,500 | ☐ Medical Bills |
| ☐ Assault & Battery | ☐ EEO | ☐ $7,500 - $50,000 | $ _____ |
| ☐ Product Liability | ☐ Other _____ | ☐ $50,000 - $100,000 | ☐ Property Damages |
| ☒ Professional Malpractice | **CONTRACTS** | ☒ Over $100,000 | $ _____ |
| ☐ Wrongful Death | ☐ Insurance | | ☐ Wage Loss |
| ☐ Business & Commercial | ☐ Confessed Judgment | | $ _____ |
| ☐ Libel & Slander | ☐ Other _____ | | |
| ☐ False Arrest/Imprisonment | **REAL PROPERTY** | **B. CONTRACTS** | **C. NONMONETARY** |
| ☐ Nuisance | ☐ Judicial Sale | | |
| ☐ Toxic Torts | ☐ Condemnation | ☐ Under $10,000 | ☐ Declaratory Judgment |
| ☐ Fraud | ☐ Landlord Tenant | ☐ $10,000 - $20,000 | ☐ Injunction |
| ☐ Malicious Prosecution | ☐ Other _____ | ☐ Over $20,0000 | ☐ Other _____ |
| ☐ Lead Paint | **OTHER** | | |
| ☐ Asbestos | ☐ Civil Rights | | |
| ☐ Other | ☐ Environmental | | |
| _____ | ☐ ADA | | |
| | ☐ Other _____ | | |

**ALTERNATIVE DISPUTE RESOLUTION INFORMATION**
Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
   A. Mediation ☒ Yes ☐ No          C. Settlement Conference ☒ Yes ☐ No
   B. Arbitration ☐ Yes ☐ No         D. Neutral Evaluation ☐ Yes ☐ No

**TRACK REQUEST**
*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL. THIS CASE WILL THEN BE TRACKED ACCORDINGLY.*
   ☐ 1/2 day of trial or less       ☐ 3 days of trial time
   ☐ 1 day of trial time           ☐ More than 3 days of trial time
   ☐ 2 days of trial time

**PLEASE SEE PAGE TWO OF THIS FORM FOR INSTRUCTIONS PERTAINING TO THE BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM AND COMPLEX SCIENCE AND/OR MEDICAL CASE MANAGEMENT PROGRAM (ASTAR), AS WELL AS ADDITIONAL INSTRUCTIONS IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, PRINCE GEORGE'S COUNTY, OR BALTIMORE COUNTY.**

Date January 14, 2015            Signature _____

CC/DCM 002 (Rev. 2/2010)          Page 1 of 3

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-205 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**
Trial within 7 months
of Filing

☐ **Standard**
Trial within 18 months
of Filing

☐ EMERGENCY RELIEF REQUESTED _____

| Signature | Date |
|---|---|

## COMPLEX SCIENCE AND/OR MEDICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO AN ASTAR RESOURCE JUDGE under Md. Rule 16-202. Please check the applicable box below and attach a duplicate copy of your complaint.*

☐ Expedited - Trial within 7 months of Filing          ☐ Standard - Trial within 18 months of Filing

---

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, PRINCE GEORGE'S COUNTY, OR BALTIMORE COUNTY PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

☐ Expedited          Trial 60 to 120 days from notice. Non-jury matters.

☐ Standard-Short      Trial 210 days.

☒ Standard            Trial 360 days.

☐ Lead Paint          Fill in: Birth Date of youngest plaintiff _____ .

☐ Asbestos            Events and deadlines set by individual judge.

☐ Protracted Cases    Complex cases designated by the Administrative Judge.

### CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

To assist the Court in determining the appropriate Track for this case, check one of the boxes below. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.

☐ Liability is not conceded, but is not seriously in dispute.

☐ Liability is seriously in dispute.

RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY

2015 JAN 14   PM 12: 02

CIVIL DIVISION

**IN THE CIRCUIT COURT FOR BALTIMORE CITY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ZVI GUTTMAN, CHAPTER 7 TRUSTEE FOR      :
THE BANKRUPTCY ESTATE OF
COMMERCE, LLC                                           :
Post Office Box 32308
Baltimore, Maryland  21282                          :

and                                                             :

COMMERCE CORPORATION                          :
2310 Smith Avenue
Baltimore, Maryland  21209                          :

and                                                             :

RICHARD J. LESSANS                                  :
2321-1 Boston Street
Baltimore, Maryland  21224                          :

          Plaintiffs,               :        CASE NO. _____

     v.                                                   :

SAUL EWING LLP, A DELAWARE               :
LIMITED LIABILITY PARTNERSHIP
500 East Pratt Street, Suite 800                     :
Baltimore, Maryland  21202
                                                                  :
Serve on:
                                                                  :
     Charles O. Monk, Esquire
      Resident Agent                                :
     Saul Ewing LLP
     500 East Pratt Street, Suite 800           :
     Baltimore, Maryland  21202
                                                                  :
and
                                                                  :
GARY EIDELMAN, ESQUIRE                     :
500 East Pratt Street, Suite 800
Baltimore, Maryland 21202                          :

          Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT AND DEMAND FOR JURY TRIAL

Zvi Guttman, Chapter 7 Trustee for the Bankruptcy Estate of Commerce, LLC ("Commerce" or "the Company"), Commerce Corporation and Richard J. Lessans, Plaintiffs, by their undersigned counsel, sue Saul Ewing LLP ("Saul Ewing") and Gary Eidelman, Esquire ("Eidelman"), Defendants, and state:

## SUMMARY OF THIS ACTION

1.      Plaintiffs were clients who engaged, and placed great trust and faith in, Defendants Saul Ewing and Eidelman as their lawyers.  Saul Ewing and Eidelman, however, betrayed that trust and faith – and committed an egregious disservice to their clients – when they chose to disregard the obvious interests of Plaintiffs and, instead, accepted instructions from Malcolm Cork, Commerce's President, to conceal from Plaintiffs, accusations brought to Eidelman by Commerce's Chief Financial Officer that Cork was engaged in a clandestine campaign to commit fraud and theft from Commerce and was causing substantial financial harm to Commerce and the other Plaintiffs.

2.      Apparently believing that Cork would ultimately acquire and control Commerce, and thus serve as the source of future engagements and income for Saul Ewing and Eidelman, Defendants aligned their interests with Cork and affirmatively concealed from Lessans, the CEO and indirect majority owner of Commerce, the written warnings and detailed descriptions of Cork's financial misconduct that the Chief Financial Officer had provided.  The concealment enabled Cork to continue perpetrating his thefts and fraud.  More than a year later, when a new Chief Financial Officer of Commerce discovered Cork's misconduct, and revealed it to Lessans, Commerce had become so deteriorated that it could no longer recover from the financial harm

that Cork had caused. Suppliers, financing sources and others lost confidence in the Company, and the Company was forced into bankruptcy.

3.    The loss of Commerce and its value is a direct and proximate result of Defendants' wrongful acts and omissions. Defendants conspired with Cork and others and, in violation of the duties that they owed to the Plaintiffs, permitted Cork to perpetrate the fraud (for which he was subsequently indicted by a grand jury of the United States District Court for the District of Maryland) that caused the demise of Commerce. It is no less than ironic – yet highly relevant and significant - that on or about the very same day that Saul Ewing and Eidelman received the warning about Cork's wrongdoings that they declined to pass on to Lessans, Saul Ewing received a valuation report of Commerce, which Saul Ewing had commissioned, establishing the value of the Company at approximately $18.8 million. This action is necessary to recover for the benefit of Plaintiffs the value of Commerce that was lost, and related damages that were suffered, as a direct and proximate result of the acts and omissions of Saul Ewing and Eidelman.

## PARTIES

4.    Plaintiff Zvi Guttman, Trustee, is the Chapter 7 Trustee for the Bankruptcy Estate of Commerce, LLC, appointed by the Office of the United States Trustee. Commerce, LLC was a Maryland limited liability company, with its principal place of business at 7603 Energy Parkway, Baltimore, Maryland 21226.   The bankruptcy case was commenced against Commerce, LLC on February 15, 2013, by the filing of an involuntary petition for relief under Chapter 7 of the Bankruptcy Code; on March 14, 2013, it was converted to a Chapter 11 case; and on May 9, 2013, it was reconverted to a case under Chapter 7.

5.      Plaintiff Commerce Corporation is a corporation formed and existing under the laws of the state of Maryland, with its principal place of business at 2310 Smith Avenue, Baltimore, Maryland 21209.  Commerce Corporation is the sole member of Commerce, LLC.

6.      Plaintiff Richard J. Lessans is a citizen of the state of Maryland.  Lessans is the majority shareholder of Commerce Corporation and, at the times relevant hereto, was Chief Executive Officer of Commerce, LLC.

7.      Defendant Saul Ewing LLP is a limited liability partnership formed and existing under the laws of the state of Delaware.  Saul Ewing carries on a regular business in Baltimore City.  At all times relevant hereto, Saul Ewing was engaged and served as lawyer and legal counsel for each of Plaintiffs.

8.      Defendant Gary Eidelman, Esquire is a citizen of, and a lawyer licensed to practice law in, the State of Maryland.  Eidelman carries on a regular business and habitually engages in the practice of law, in Baltimore City as a partner of Saul Ewing.  At all times relevant hereto, Eidelman was engaged and served as lawyer and legal counsel for Commerce.

### JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

10.     Venue is proper in Baltimore City, Maryland, pursuant to Md. Code Ann. § 6-201, because (a) Saul Ewing carries on a regular business and maintains its principal office in Maryland in Baltimore City and (b) Eidelman carries on a regular business, is employed, and habitually engages in the practice of law in Baltimore City.

## FACTS

### Commerce Was a Viable Company and an Industry Leader

11.     In 1923, the Lessans family established the business that would eventually become Commerce, LLC.  In 1947, they formed Commerce Corporation and operated the business through that entity.  In 1997, they formed Commerce, LLC, to which they transferred the business, and made Commerce Corporation its sole member.

12.     Commerce functioned as a distributor of two primary product lines: lawn and garden products and holiday decorating products.  With exceptional insight to the workings of the industry, decades of carefully forged relationships, an outstanding corporate reputation and diligent planning and oversight of the Company's operations, the Lessans family grew Commerce to become the largest independent lawn and garden distributor in the United States. Commerce was the largest distributor of Scotts.$^{TM}$ lawn and garden products, and was also the leading distributor for other nationally known manufacturers.  By 2011, Commerce had approximately 275 employees and operated out of warehouse space in four states.

13.     Commerce remained profitable through the great recession of 2008, maintaining its position in the industry and substantial profitability.  In the year ending December 2010, the year before Cork began perpetrating his fraud with the help of Saul Ewing and Eidelman, Commerce had sales totaling nearly $205 million, and generated a gross profit on goods sold of nearly $42 million.  Commerce's reported 2010 EBITDA (earnings before income taxes, debt and amortization) was $4,247,625.

14.     In September 2004, Lessans hired Cork to be the President of Commerce – reporting to Lessans, the Company's CEO.  On October 11, 2004, Cork began his employment with Commerce.

## Saul Ewing and Eidelman Were Lawyers for Plaintiffs

15.    At the time of the events giving rise this Complaint, Saul Ewing had been the lawyers for the Lessans family and the Plaintiffs for many years. From at least 2009, Saul Ewing and Eidelman had represented Commerce in connection with its relationships with its officers and employees. Saul Ewing and Eidelman also served as counsel for Commerce in connection with the 2010 negotiation of a new five-year employment contract for Cork.

16.    Eidelman knew from his representation of Commerce, and Cork's employment contract confirmed, that the day-to-day affairs of Commerce were run by Cork, its President. Cork oversaw the payment of Saul Ewing's bills, and he was responsible for Commerce's continued employment of Saul Ewing. Eidelman was also aware that, in the event the Lessans family chose to sell the Company, Cork had the "right of first refusal" to match any legitimate offer. Thus, Saul Ewing and Eidelman understood that the road to further engagement and legal fees for Saul Ewing ran through the door to Cork's office. Eidelman therefore sought to develop a close and personal relationship with Cork. Upon information and belief, Cork, at Eidelman's request, hired Eidelman's son as a summer employee of Commerce.

17.    Saul Ewing and Eidelman were nonetheless also aware that the owner of Commerce was Commerce Corporation, which was primarily owned by Lessans. Saul Ewing and Eidelman further knew and understood that Cork reported to Lessans and that Lessans had the ultimate authority in the Company, including the right to terminate Cork's employment.

18.    Saul Ewing also provided tax and estate planning services to Lessans and Commerce Corporation. In 2011, as part of Saul Ewing's continuing representation of Commerce Corporation and the Lessans family, Eileen Day O'Brien, Esq., a Saul Ewing lawyer, performed services for Lessans and Commerce Corporation that required her to obtain a

valuation of Commerce as of December 31, 2010. The valuation, performed by Tucker & Meltzer under an engagement agreement with Saul Ewing, determined that the value of the Company was approximately $18.8 million.

19.   As a result of the foregoing engagements, and perhaps others, Saul Ewing and Eidelman had active and ongoing attorney-client relationships with the Plaintiffs at all times relevant to this action.

20.   As lawyers for the Plaintiffs, who undertook to represent them continuously in a wide variety of matters, Saul Ewing and Eidelman were fiduciaries who owed the Plaintiffs, and each of them, the following duties among others: (i) the duties of utmost loyalty, good faith and honesty; (ii) the duty to provide competent representation to the Plaintiffs, including thoroughness and preparation reasonably necessary for the representation; (iii) the duty to act with reasonable diligence and promptness in representing the Plaintiffs; (iv) the duty to keep the Plaintiffs reasonably informed of the status of each matter for which Saul Ewing and Eidelman were acting as lawyers; and (v) the duty not to advance or protect the interests of employees of the Plaintiffs if those interests presented a conflict of interest with the Plaintiffs.

### Cork Devised A Scheme to Defraud The Plaintiffs

21.   In or before 2010, Cork devised a scheme to defraud the Plaintiffs for his own personal benefit. From time to time, Cork enlisted the assistance of Carol Jacober, the Director of Human Relations of Commerce, and, as averred below, the assistance of Saul Ewing and Eidelman as well.

22.   As a part of the scheme to defraud, and in the execution thereof, Cork: (i) caused Commerce to make disbursements to himself which he did not intend to repay; (ii) caused Commerce to make disbursements for his own benefit that he disguised as expenditures for

Commerce's business; (iii) falsified copies of the annual audit reports issued by Commerce's outside auditors and presented the falsified copies to Lessans as though they were genuine; and (iv) caused false entries to be made in Commerce's books and records to inflate the earnings of Commerce and thereby to increase the amounts paid by Commerce for Cork's bonuses and 5% profits interest and to conceal weaknesses and mismanagement in the business operations which he was directing.

### Without Informing Lessans, Cork Took a $450 Thousand "Loan" From Commerce Which Cork Had No Intention of Repaying

23.    On July 15, 2010, Cork informed Bryant O'Kane ("O'Kane"), Commerce's CFO, that Cork needed to obtain an immediate loan from Commerce, and he directed O'Kane to wire $450,000 of Commerce funds to an account in Cork's name that same day.   At O'Kane's insistence, Cork prepared and signed a loan agreement for the transaction.   The agreement provided that the loan would be repaid by October 31, 2010, and if not repaid, to be applied to the bonus that would otherwise be payable to Cork for 2010.   Lessans did not authorize the disbursement, and neither Cork nor anyone else at Commerce made him aware of it.

24.    On later occasions, when O'Kane reminded Cork of his obligation to repay the $450,000, Cork told O'Kane that he had no intention of repaying Commerce and that he would not do so.   And, in fact, Cork did not make any repayment and took the full amount of his 2010 bonus.

### Cork Provided Lessans A Fraudulently Altered Audit Report To Conceal From Lessans The $450 Thousand "Loan"

25.    Commerce's auditor was Clifton Gunderson.   On or about March 18, 2011, Clifton Gunderson delivered to Cork its audit report on Commerce's 2010 financial statements. The audited balance sheet included the $450,000 as part of a line item entitled, "Notes

receivable, related party." Note 8 of the Balance Sheet, entitled, "Transactions with Related Parties," stated that, "In July 2011, the company entered into a demand note receivable with an executive of the Company for $450,000," and that, "The balance remaining on this note, including interest accrued, is $452,226 as of December 26, 2010."

26.    Each year, upon receipt of the annual audit report, Cork would transmit a copy to Lessans for his review. In order to conceal the transaction from Lessans, Cork fraudulently altered the 2010 audit report and delivered the altered version to Lessans. In the altered version, Cork changed the balance sheet by removing the $452,226 from the related party notes receivable and added that amount to the amount stated for prepaid expenses. Cork removed the page containing Note 8 and substituted a retyped page in which he eliminated all references to the July 2010 transaction.

### Eidelman Was Informed of Cork's Fraudulent Conduct Yet Agreed to Not Inform Lessans of It

27.    On April 19, 2011, Bryant O'Kane, the CFO of Commerce, precipitously left his employment. That same day, he sent a letter to Carol Jacober, the Director of Human Resources for Commerce, asserting that he had taken indefinite leave because he had been employed in a hostile work environment and had been harassed. O'Kane asserted his claim against Commerce, Commerce Corporation and Messrs. Lessans and Cork. Jacober promptly transmitted a copy of that letter to Cork, who advised her to work with Eidelman to handle the allegations made by O'Kane. Jacober sent a copy of the April 19, 2011 letter to Eidelman.

28.    The following day, April 20, 2011, O'Kane sent to each of the Maryland Commission on Human Relations and the United States Equal Employment Opportunity Commission letters that were virtually identical to the letter that he had sent the previous day to

Jacober. O'Kane addressed copies of those two letters to Jacober, Cork, and, most importantly, to Lessans. However, as described below, all of O'Kane's communications copied to Lessans or otherwise concerning O'Kane's claims, were diverted by Cork and Jacober and none ever reached Lessans. Yet, Eidelman received copies of all of those communications.

29.    Among the hostile work environment claims set forth in each of O'Kane's letters was one very striking revelation that O'Kane made about the scheme by Cork to defraud Commerce. Each letter prominently stated the following:

> A similar situation arose regarding a loan that Cork received on July 15, 2010 from Commerce. On that day, Cork abruptly advised me that he needed a $450,000.00 personal loan from Commerce with the funds wired to his account by 2 p.m. Lessans was not available and I indicated that it would need to be signed off by [ Jacober] and the Comptroller, Melinda Bowling, which it was. I was not aware of whether the loan documentation has ever been presented to Lessans. I did not personally convey the loan matter to Lessans based on the prior incident and his admonition not to ever bother him about personal compensation issues involving him and Cork. *I later came across information suggesting that Cork may be concealing the loan, namely what appears to be a modified audited financial statement.* Cork repeatedly assured me that the loan would be paid but *I believe it remains outstanding. At times when I inquired about the loan, Cork would reverse himself and state things such as "[expletive] him, I am not paying him," referring to the repayment of the loan to Lessans and Commerce.*

(emphasis added).

30.    In light of the fact that O'Kane's letters stated very specific and detailed facts about dishonest conduct on the part of Cork, and was based upon personal knowledge that O'Kane had acquired in his capacity as the Chief Financial Officer of the Company, there was every reason for Eidelman to take those assertions with the utmost seriousness, to investigate the assertions, and, more importantly, to alert Lessans to them. As the Chief Financial Officer, O'Kane was responsible for overseeing the Company's financial affairs and was undoubtedly the person at Commerce with the most detailed knowledge of the Company's financial transactions.

31.     Rather than pursue O'Kane's allegations and report them to Lessans, the one individual at the Company with higher authority than Cork and the effective owner of Commerce, Saul Ewing and Eidelman instead acceded to Cork's importuning that Eidelman not communicate with Lessans. As a result, Lessans never learned about those allegations. In one particular telephone call, Cork told Eidelman and Jacober that they were not to discuss O'Kane's letter with Lessans. In other conversations with Eidelman, Cork and Jacober reiterated that Eidelman should communicate only with them and not with Lessans. Cork also instructed Eidelman to work out an arrangement or settlement with O'Kane's lawyer to "just make it go away."

32.     The very fact that Cork was asking Eidelman to do precisely what Cork stood accused of – concealing allegations of Cork's financial improprieties from Lessans – should have caused Saul Ewing and Eidelman to recognize that it was imperative for them to report the matter to Lessans. Yet, Eidelman agreed to keep O'Kane's evidence hidden from Lessans because Cork asked him to do so.

33.     Eidelman, however, recognized that it was necessary for him to undertake an investigation in response to O'Kane's claims. Eidelman oversaw an investigation of O'Kane that included an evaluation of O'Kane's job performance and searches of O'Kane's office, computer hard drive, e-mails and expense accounts. At no time, however, did Eidelman ask Dennis Koerner, O'Kane's successor as Chief Financial Officer of Commerce, about O'Kane's statements concerning Cork's theft and falsification of the Company's financial statements, nor did he otherwise competently and diligently investigate the matter.

**Eidelman, Working With Jacober at Cork's Direction,**
**Took Affirmative Actions That Prevented Lessans from Learning**
**About O'Kane's Warnings of Cork's Fraudulent Conduct**

34.    Promptly after receiving the letters from O'Kane, Eidelman called O'Kane's counsel to request that he and O'Kane transmit no further communications directly to Commerce, where Lessans might learn of them. Simultaneously, Jacober – at Cork's direction and with Eidelman's knowledge – collected all of the letters that O'Kane had sent to Commerce, including particularly the copies contained in envelopes mailed to the attention of Lessans at Commerce. Jacober took those envelopes to her home and then, at Cork's direction, clandestinely delivered the envelopes to Cork at a restaurant in Linthicum, Maryland.  Eidelman was aware that Jacober was intercepting the communications directed to Lessans.

35.    Later, at Cork's further instruction, Jacober wrote to Eidelman to confirm that Eidelman would "get the EEOC and MHRC to agree to send their notices and correspondence on the O'Kane matter to you rather than [to Commerce]."  Eidelman subsequently reported to Cork and Jacober his success in halting any further communications about the matter from being transmitted to Commerce, where they might become known to Lessans.

36.    As a result, Eidelman knew that no information about O'Kane and, particularly, the statements that O'Kane had made concerning Cork, would reach Lessans through Eidelman, Cork, Jacober or any other source.  Eidelman should reasonably have recognized that the only way in which Lessans could learn that Cork stood accused of stealing from Lessans' company, and of falsifying financial statements to conceal that theft, would be if Eidelman were to tell Lessans. Yet, Saul Ewing and Eidelman did not do so.

37.    Instead, Eidelman pursued Cork's mandate to settle O'Kane's claims quickly and quietly. On May 12, 2011, Eidelman met with O'Kane's lawyer, and by May 23, 2011, began

12

drafting a settlement agreement.  The settlement agreement provided that Commerce would pay O'Kane a substantial sum of money.  It also contained a confidentiality clause to ensure that O'Kane had not, and would not, disclose any of his allegations to any other person.  Neither Eidelman nor Cork nor Jacober made Lessans aware of the settlement.

### Safe From Detection, Cork Continued To Pursue His Fraudulent Scheme

38.    Confident that he had escaped Lessans' detection, Cork continued to pursue his fraudulent scheme.  Among other things:

(A).    On July 15, 2011, Cork caused Commerce to wire $187,500 to an Ohio bank for credit to the account of Chemence, LLC ("Chemence").  The transfer was ostensibly for payment of a Commerce obligation.  In actuality, the payment was for the payment of outstanding trade debt owed by Medical Solutions International, Inc. ("MSI"), a medical supply company in South Carolina that Cork had surreptitiously formed for himself.  Chemence, the recipient of the payment, was a manufacturer of medical products that supplied MSI.

(B).    On August 5, 2011, Cork caused Commerce to wire $200,000 to Citibank for credit to an account identified only by number.  When asked about this transfer by Dennis Koerner, O'Kane's successor as CFO of Commerce, Cork claimed that the transfer had been for Commerce to acquire another supplier.  In actuality, there was no such acquisition by Commerce, and Cork controlled the account to which the funds were transferred.

39.    Throughout 2011 and the first half of 2012, as a further part of his scheme to defraud, Cork manipulated Commerce's financial reporting and caused Commerce to overstate its 2011 profits by approximately $4.7 million. Among other things, Cork caused Commerce not to enter accrued expenses for such items as bonuses, vacation expenses, pension expenses, commissions, sales rebates and freight. He also caused various expense items to be changed to prepaid assets. Having artificially increased Commerce's reported profitability, Cork caused Commerce to pay him $235,000 for his 5% profit interest.

40.    Among the effects of Cork's scheme to defraud, including his manipulation of Commerce's financial records, these manipulations concealed from the Plaintiffs the true state of Commerce's business and financial affairs and deprived Plaintiffs of the opportunity to minimize Commerce's expenses, maximize its profits, stabilize all aspects of its business and otherwise keep Commerce on the path to success.

### Commerce's Successor CFO Discovered Cork's Fraud and
### Reported It to Lessans More Than a Year After Eidelman Was Alerted to It

41.    On April 27, 2012, Cork instructed Dennis Koerner, O'Kane's successor as CFO of Commerce, to issue a $150,000 check to "MSI," at an address in Valley Stream, New York, and to hand deliver the check to Cork for transmittal to the payee. Cork told Koerner that MSI was a broker for Commerce's purchase of a company known as Ray Padula Enterprises, a manufacturer of lawn sprinklers. Koerner caused the check to be issued and given to Cork for transmittal.

42.    Some time later, Koerner obtained a copy of the check from M&T Bank, the bank on which it was drawn. Examining the back of the check, Koerner found that the check had been endorsed for deposit only by Medical Solutions, Inc., and had been deposited, on the same day

that it was issued, into an account in the name of that company at a Baltimore office of Bank of America.

43.     Koerner reported to Lessans the information about the $150,000 transaction that he unearthed. It was then apparent to both Koerner and Lessans that Cork had engaged in fraud and theft. Lessans also decided that he needed the assistance of his attorneys in terminating Cork and in pursuing an investigation of Cork's activities.

44.     Lessans, who remained unaware of O'Kane's settled claim, and still knew nothing about O'Kane's statements about Cork, sought the advice of Saul Ewing and Eidelman. With Cork's misconduct out in the open, Eidelman had no choice but to assist Commerce in terminating Cork's employment on June 25, 2012. Eidelman also participated with lawyers from another law firm in the subsequent investigation of Cork, which, with the assistance of a forensic accounting team, uncovered further details of Cork's scheme, including additional thefts, and substantiated the claims that had been made by O'Kane more than a year previously. The investigation revealed that Cork had engaged in widespread falsification of Commerce's financial documents in order to (i) conceal his thefts, (ii) create artificial earnings on which Cork had paid himself increased compensation for 2011 and (iii) mask weaknesses and mismanagement in the operation of Commerce by Cork throughout 2011 and the first half of 2012. Of course, Saul Ewing and Eidelman had the opportunity – and obligation – to have conducted a reasonably competent and diligent investigation more than a year earlier, or at least to have disclosed to Lessans the information that would have allowed Lessans to have conducted that investigation at that earlier date in April 2011.

45.     On July 22, 2012, while the investigation was under way, Eidelman called Lessans and told him that he had something to share with him. Eidelman asked Lessans to meet

15

him for breakfast at a restaurant the following morning. At that meeting, Eidelman pulled from his briefcase and presented to Lessans the very letter that O'Kane had delivered to the company – and had copied to Lessans – in April 2011. Eidelman said that this was something that he should have shared with Lessans in April 2011 but that he had not alerted Lessans at the time because Cork had told Eidelman not to tell Lessans anything about it. The revelation shocked Lessans.

46.     Late in the evening of July 23rd, Eidelman sent an e-mail to Lessans. "Thank you for meeting with me this morning to discuss this matter," Eidelman wrote, adding that, "I know that it was very difficult to read that letter." Lessans responded that Cork must have engineered O'Kane's resignation, settlement and confidentiality agreement so that Cork "would not have to deal with a CFO who was questioning his accounting practices and the $450K loan." Eidelman replied that, "As I sit here knowing what I know now, I swear you are right."

### Eidelman's Acts and Omissions Allowed Cork to Further Pursue His Fraudulent Scheme and Caused the Demise of Commerce

47.     Eidelman's failure to report O'Kane's accusations about Cork to Lessans ensured that the criminal at the helm of the Company – who was defrauding the Company on a continuing basis – would remain unreported to the Company's owners and would remain able to continue the thefts for which he was ultimately indicted. Saul Ewing and Eidelman ignored the detailed warnings from O'Kane and acceded to Cork's requests to ensure that Lessans was not told about – and would not otherwise discover – the accusations made by the company's Chief Financial Officer that Cork was defrauding the company.

48.     On March 20, 2014, a Grand Jury of the United States District Court for the District of Maryland indicted Cork for wire fraud. The charges in the Indictment against Cork are a virtual mirror of the allegations that Saul Ewing and Eidelman received from O'Kane in

April, 2011 and, as such, had the opportunity to expose and stop Cork at that time. The

Indictment alleges:

> It was part of the scheme to defraud that CORK, by fraudulent representations to other Company employees, **took and obtained Company funds that he disguised as a $450,000 "shareholder' loan' to himself**, which transaction had not been authorized by the Board or any other authorized party of the Company, nor disclosed to the Board or the Company's key principal. Subsequently, Cork **manipulated the audited financial statements** of the Company to conceal the fact that this money had been issued to him.

O'Kane wrote on April 19 and 20, 2011 that:

> Cork abruptly **advised me that he needed a $450,000.00 personal loan** from Commerce with the funds wired to his account by 2 p.m. . . . I was not aware of whether the loan documentation has ever been presented to Lessans. I later came across information suggesting that Cork may be concealing the loan, namely what appears to be **a modified audited financial statement**. Cork repeatedly assured me that the loan would be paid but I believe it remains outstanding. At times when I inquired about the loan, **Cork would reverse himself and state things such as "[expletive] him, I am not paying him," referring to the repayment of the loan to Lessans and Commerce.**

(emphasis added).

49.    Had Saul Ewing and Eidelman acted as required in response to O'Kane's April

2011 warnings, by passing those warnings on to Lessans, the effective owner of the Company

and the one person who had the authority to order an investigation of Cork and to terminate his

employment, the additional – and subsequent – fraudulent conduct alleged in the Indictment, as

well as the fraudulent conduct uncovered during the investigation after Commerce discharged

Cork, would never have been able to take place.

### Saul Ewing's and Eidelman's Failure to Report the Accusations About Cork Was a Substantial and Contributing Factor to the Demise of Commerce

50.    By acting, or failing to act, in the manner described above, Saul Ewing and

Eidelman permitted Cork to continue to perpetrate his defalcations and fraud upon the Company.

But for Saul Ewing's decisions and actions to follow Cork's instructions and conceal the allegations about Cork from Lessans, Cork's theft and fraud could – and would – have been discovered and stopped. Instead, Saul Ewing's and Eidelman's acts and omissions permitted Cork to continue stealing money from Commerce and to conceal his theft and other fraudulent activity, as well as the financial instability of the company, from Lessans, the one person with the power and authority to stop it.

51.    Throughout 2011 and the first half of 2012, as averred above, Cork continued his falsification of Commerce's financial records to conceal his further thefts, to create artificial income to justify bonuses that he received and to hide losses resulting from his mismanagement of Commerce. In all, Cork's falsifications concealed more than $1 million in outright thefts and $4.7 million in artificially inflated 2011 profits.

52.    Had Lessans been made aware of Cork's theft and falsification of Commerce's financial records in April 2011, he would have fired Cork then and there. Commerce would have conducted an investigation of Cork's activities at that time, the same as it did in 2012, and would have discovered the inflated profits that were being misrepresented and operating deficiencies that had been, and were being, concealed by Cork. Commerce would have been able to avoid incurring losses while it was still solvent and would have been able to manage the problems that Cork had caused. Indeed, upon learning of Cork's fraud in June 2012, Commerce, with the assistance of a turn-around and restructuring expert, implemented numerous changes in its operations in order to stem losses caused by Cork and turn the Company on a course to profitability. Had those changes been implemented more than a year earlier, the turn-around effort would have succeeded.

53.     By the time Cork's fraud scheme was discovered in June 2012, however, it was too late to remedy the damage that Cork had caused to the Company. By that time, Cork had rendered the Company irreparably insolvent.  The relationship between Commerce and The Scotts Company, its principal supplier and provider of financing, was irretrievably damaged, and Commerce was unable to recover.

54.     Because the lawn and garden business is seasonal, Scotts would sell tens of millions of dollars of inventory to Commerce in the fall of the year and would effectively finance Commerce's operations by deferring payment until the following summer, after the Company had generated revenues from sales of that inventory to its retailers.  In late 2012, after Commerce informed Scotts of the extent of the losses caused by Cork's previously concealed misconduct, Scotts informed Commerce that it would no longer extend credit to Commerce and terminated its business relationship with Commerce.  Other suppliers followed suit.

55.     Cork's manipulation of Commerce's books and records had created a distorted picture of Commerce's financial condition and had allowed Cork to lead the Company down the road to financial ruin completely unbeknownst to Lessans.  Had Lessans known that his company was being looted and mismanaged due to Cork's fraud, he and the Company would have been able to trim expenses, avoid unnecessary debt and restructure the Company so that it could be on a sound financial footing. And the Company would not have had to disclose any financial predicament to Scotts, thereby retaining its largest and most important supplier and its largest financing source.

56.     Saul Ewing and Eidelman had the knowledge and opportunity – and the legal and ethical duties – to have stopped the fraud and to have enabled Commerce to remove Cork early enough to have saved the Company from its ultimate financial ruin.  Unfortunately, they failed to

report what they had learned to Lessans, the owner of the Company.    Saul Ewing's and Eidelman's acts and omissions, and breaches of duty, proximately caused the demise of Commerce and losses of approximately $29 million.

57.    As a Saul Ewing lawyer wrote on October 20, 2011, "Commerce is seen as having a tremendous potential for appreciation in the years ahead." But for the acts and omissions of Saul Ewing and Eidelman, as described herein, Commerce would have in fact realized that "tremendous potential for appreciation."

## COUNT ONE
## NEGLIGENCE – LEGAL MALPRACTICE

58.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs as if the same were set forth and realleged herein.

59.    At all times relevant hereto, Saul Ewing and Eidelman had attorney-client relationships with Plaintiffs Commerce, Commerce Corporation and Lessans.

60.    As lawyers for Plaintiffs, Saul Ewing and Eidelman had duties to act with the utmost good faith and loyalty, including the obligation to make known to Plaintiffs all information that was significant and material to matters that were the subject of the relationship.

61.    As counsel for Commerce who received information indicating that Cork, as President of Commerce, was engaged in actions or intended to act in a way that violated a legal obligation to the Company that were likely to cause substantial injury to Commerce, Saul Ewing and Eidelman had the duties described in Paragraph 20 above as well as the duty to proceed in what they reasonably believed to be the best interests of the Company, and not their own self-interests or that of Cork.

20

62.     Saul Ewing's and Eidelman's duty of care to the Plaintiffs required them to act diligently and to exercise care by taking steps to prevent reasonably foreseeable harm to Commerce.

63.     Eidelman knew that Cork was engaged in action, intended to act or refused to act in violation of a legal obligation to the Company, or in violation of law that was likely to result in substantial injury to Commerce.  Eidelman further knew that Commerce was likely to be substantially injured by Cork's unlawful and unauthorized actions.  Eidelman thus had the duty to proceed as was reasonably necessary in the best interest of Commerce by, among other things, taking steps to have the matter reviewed by Lessans, the one individual with a higher authority in the Company than Cork.

64.     Saul Ewing and Eidelman had a duty to alert Lessans of O'Kane's allegations even if those allegations fell outside the scope of Saul Ewing's and Eidelman's engagement – though they did not.   Saul Ewing and Eidelman were not free to disregard the allegations made by O'Kane concerning Cork, because those allegations reasonably put Eidelman on notice that Plaintiffs were being defrauded.

65.     Saul Ewing and Eidelman were made aware of allegations – made with specific personal knowledge by the Chief Financial Officer – that a fraud was being perpetrated upon Commerce.   Saul Ewing and Eidelman were further aware that Lessans, as the CEO and effective owner of the company (in which Cork had no ownership interest), was the only person with authority higher than Cork and, thus, the only person with the ability to investigate and confirm the allegations, take the action necessary to terminate Cork's employment, seek to recover the funds and, most important, ensure that no further embezzlement would have taken place.  Indeed, Saul Ewing and Eidelman also knew that Cork – the person accused of theft and

21

concealment – was taking additional affirmative steps to conceal from Lessans the allegations of Cork's wrongdoing. Under these circumstances, Saul Ewing and Eidelman had the duty to investigate O'Kane's allegations competently and with reasonable diligence and to report to Lessans what they had learned.

66.    Saul Ewing's duty to investigate or report the allegations about Cork to Lessans was heightened by the fact that, at the very same time that it was representing Commerce in the O'Kane matter, Saul Ewing was also representing Lessans and Commerce Corporation in addition to its representation of Commerce. Saul Ewing therefore owed independent duties of care, loyalty and diligence to Lessans and Commerce Corporation. Accordingly, upon receiving the allegations made by O'Kane, Saul Ewing had duties to investigate those allegations capably and to report them to Commerce Corporation and Lessans.

67.    Saul Ewing and Eidelman breached the duties owed to Plaintiffs by, among other things:

a.    Failing to alert Lessans of O'Kane's allegations concerning Cork;

b.    Failing to investigate O'Kane's allegations concerning Cork;

c.    Failing to alert Lessans of the actions taken by Cork and Jacober to conceal O'Kane's allegations concerning Cork from Lessans;

d.    Taking affirmative actions to ensure that Lessans did not learn of O'Kane's allegations concerning Cork;

e.    Failing to protect Commerce, Commerce Corporation and Lessans from the harm perpetrated by Cork; and

f.    Failing to fulfill the duties set forth in Paragraph 20 above.

22

68.    Plaintiffs have suffered and will continue to suffer substantial economic damages as a direct and proximate result of these actions and inaction by Saul Ewing and Eidelman.

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

(a)    a judgment for compensatory damages against Defendants Saul Ewing, LLP and Gary Eidelman, jointly and severally, for an amount no less than $75,000.00; and

(b)    such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

## COUNT TWO
## BREACH OF AGENCY CONTRACT

69.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs as if the same were set forth and realleged herein.

70.    Saul Ewing and Eidelman, as lawyers for Commerce, Commerce Corporation and Lessans, were parties to an agency contract with the Plaintiffs and, pursuant thereto, maintained a principal/agent relationship with Plaintiffs.  As a part of the agency contract, Saul Ewing and Eidelman, as lawyers for Commerce, Commerce Corporation and Lessans, were also in a confidential relationship with Plaintiffs.  Consequently, Saul Ewing and Eidelman stood in a fiduciary capacity with respect to their services and duties to Plaintiffs.

71.    Saul Ewing and Eidelman were in positions of trust with, and had superior knowledge to, Commerce, Commerce Corporation and Lessans and, pursuant to the agency contract, owed to them (i) undiluted and undivided loyalty, (ii) honesty and candor, highest fidelity, (iii) full and complete disclosure, and (iv) utmost care and freedom from self-dealing and conflicts of interest, as well as the other duties set forth in Paragraph 20 above.

72.    By acting and failing to act in the manners described herein, Saul Ewing and Eidelman breached their fiduciary duties and duties of loyalty to Commerce, Commerce Corporation and Lessans, and thereby breached the agency contract, by, among other things:

a.    Failing to alert Lessans of O'Kane's allegations concerning Cork;

b.    Failing to investigate O'Kane's allegations concerning Cork with competence and diligence;

c.    Failing to alert Lessans of the actions taken by Cork and Jacober to conceal O'Kane's allegations concerning Cork from Lessans;

d.    Taking affirmative actions to ensure that Lessans did not learn of O'Kane's allegations concerning Cork;

e.    Failing to protect Commerce, Commerce Corporation and Lessans from the harm perpetrated by Cork; and

f.    Failing to fulfill the duties set forth in Paragraph 20 above.

73.    Saul Ewing and Eidelman acted with reckless disregard for the rights of Commerce, Commerce Corporation and Lessans.

74.    Plaintiffs fulfilled all of their obligations under their agency contract with Saul Ewing.

75.    Plaintiffs have suffered and will continue to suffer substantial economic damages as a direct and proximate result of these actions and inaction by Saul Ewing and Eidelman constituting breaches of their obligation under the agency contract with Plaintiffs.

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

(a)    a judgment for compensatory damages against Defendants Saul Ewing, LLP and Gary Eidelman, jointly and severally, for an amount no less than $75,000.00; and

24

(b)     such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

## COUNT THREE
## CONSTRUCTIVE FRAUD

76.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs as if the same were set forth and realleged herein.

77.     Saul Ewing and Eidelman, as lawyers for Commerce, Commerce Corporation and Lessans, maintained a principal/agent relationship with Plaintiffs. Saul Ewing and Eidelman, as lawyers for Commerce, Commerce Corporation and Lessans, were also in a confidential relationship with Plaintiffs. Consequently, Saul Ewing and Eidelman stood in a fiduciary capacity with respect to their services and duties to Commerce, Commerce Corporation and Lessans.

78.     Saul Ewing and Eidelman were in positions of trust with, and had superior knowledge regarding, Commerce, Commerce Corporation and Lessans and owed to them the fiduciary duties set forth in paragraphs 20 and 59 through 66, and 71 above.

79.     Saul Ewing and Eidelman willfully and intentionally committed breaches of the fiduciary duties that they owed to Plaintiffs as averred in paragraphs 27 through 37, 47 through 52 and 72 above.

80.     As averred in paragraphs 27 through 37, 47 through 52, and 72 above, Saul Ewing and Eidelman engaged in conduct which deceived Plaintiffs and violated the confidences that Plaintiffs reposed in Saul Ewing and Eidelman as their lawyers.

81.     Plaintiffs have suffered and will continue to suffer substantial economic damages as a direct and proximate result of these actions and inaction by Saul Ewing and Eidelman.

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

(a)    a judgment for compensatory damages against Defendants Gary Saul Ewing and Eidelman, LLP, jointly and severally, for an amount no less than $75,000.00; and

(b)    such further relief, including costs, interest, and attorneys' fees, as the Court may deem fit and proper.

## COUNT FOUR
### INTENTIONAL CONCEALMENT

82.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs as if the same were set forth and realleged herein.

83.    As lawyers for Commerce, Commerce Corporation and Lessans, Saul Ewing and Eidelman owed fiduciary duties and duties of loyalty and disclosure to Commerce, Commerce Corporation and Lessans.    The duties that Saul Ewing and Eidelman had to Commerce, Commerce Corporation and Lessans included the duty to disclose to Plaintiffs, and not to conceal from them, all information that was significant and material to matters that were the subject of the relationship, as well as those duties set forth in Paragraph 20 above.    Saul Ewing and Eidelman had duties to make known to Plaintiffs, and not to conceal from them, the allegations made by O'Kane about Cork.

84.    Saul Ewing and Eidelman were made aware of O'Kane's allegations concerning Cork, and knew that those allegations came from an individual with specific personal knowledge that a fraud was being perpetrated upon Commerce by Cork.    Saul Ewing and Eidelman also knew that Cork – the person accused of theft and concealment – was taking additional affirmative steps to conceal from Lessans the allegations of Cork's wrongdoing.    Under these circumstances, Saul Ewing and Eidelman had the duty to report to Lessans, as the CEO of

26

Commerce and the primary owner of Commerce Corporation, and to not conceal from him, what they had learned.

85.     Saul Ewing and Eidelman intentionally failed to disclose to Lessans and, indeed, took affirmative steps to conceal from Lessans, O'Kane's warnings about Cork's fraudulent acts.

86.     Saul Ewing and Eidelman concealed these material facts from Lessans with the intent to deceive him and the other Plaintiffs. Saul Ewing and Eidelman knew that, if Lessans was made aware of O'Kane's warnings about Cork, Lessans would have promptly investigated Cork and his actions and, upon learning of Cork's theft and falsification of Commerce's financial records in April 2011, he would have fired Cork at that time.

87.     Plaintiffs justifiably and reasonably relied upon Saul Ewing's and Eidelman's intentional concealment of these material facts and, in justifiable and reasonable reliance thereon, did not conduct an investigation of the fraud being perpetrated upon Plaintiffs by Cork. Had Plaintiffs known that Saul Ewing and Eidelman had concealed from Lessans the warnings and allegations made by O'Kane, Plaintiffs would have promptly investigated Cork and his actions and, upon learning of Cork's theft and falsification of Commerce's financial records in April 2011, Lessans, on behalf of Plaintiffs, would have fired Cork at that time.

88.     Saul Ewing's and Eidelman's intentional concealment of material facts, as described herein, directly and proximately caused all of the damages to Plaintiffs described herein.

89.     Plaintiffs have suffered and will continue to suffer substantial economic damages as a direct and proximate result of these actions and inaction by Saul Ewing and Eidelman.

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

(a)     a judgment for compensatory damages against Defendants Saul Ewing, LLP and

Gary Eidelman, jointly and severally, for an amount no less than $75,000.00; and

(b)     such further relief, including costs, interest, and attorneys' fees, as the Court may

deem fit and proper.

Dated: January 14, 2015

_____
Arnold M. Weiner
Aron U. Raskas
Barry L. Gogel
RIFKIN, WEINER, LIVINGSTON,
   LEVITAN & SILVER, LLC
2002 Clipper Park Road, Suite 108
Baltimore, Maryland 21211
(410) 769-8080

*Attorneys for Plaintiffs.*

## DEMAND FOR JURY TRIAL

Plaintiffs, by their undersigned attorneys, pursuant to Maryland Rule 3-325, hereby

demand and elect a jury trial of this action for all counts so triable.

_____
Arnold M. Weiner
Aron U. Raskas
Barry L. Gogel

28